## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

IN RE NOVAVAX INC. STOCKHOLDER
DERIVATIVE LITIGATION,

This Document Relates To:

ALL ACTIONS

Civil Action No. TDC-21-2996
Civil Action No. TDC-22-1415
Civil Action No. TDC-22-1417

### MEMORANDUM OPINION

In this shareholder derivative action filed on behalf of Novavax, Inc. ("Novavax"), Plaintiffs allege that Novavax Chief Executive Officer Stanley C. Erck, three other Novavax officers, and members of Novavax's Board of Directors engaged in violations of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a)(1) (2018) ("the Exchange Act") and Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9 (2022); breaches of fiduciary duty; and unjust enrichment. Defendants have filed a Motion to Dismiss, which is fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Defendants' Motion will be GRANTED IN PART and DENIED IN PART.

### BACKGROUND

Prior relevant factual background is set forth in the Court's December 12, 2022 Memorandum Opinion in the related class action, *Sinnathurai v. Novavax, Inc.*, No. TDC-21-2910, which is incorporated by reference. *Sinnathurai v. Novavax, Inc.*, ___ F. Supp. 3d ___, No. TDC-21-2910, 2022 WL 17585715 (D. Md. Dec. 12, 2022). The specific factual allegations and procedural history relevant to the Motion are set forth below.

**I.     Novavax Corporate Structure**

Novavax, a Delaware corporation, is a biotechnology company headquartered in Gaithersburg, Maryland that engages in the development and commercialization of vaccines to prevent serious infectious diseases. Novavax has common stock that trades on the NASDAQ stock exchange. Defendant Stanley C. Erck has served as the Chief Executive Officer ("CEO") and President of Novavax since 2011 and as a member of its Board of Directors ("the Board") since 2009. At the time of the events at issue in this case, between March and October 2021, Defendant John J. Trizzino was Novavax's Chief Business Officer, Chief Commercial Officer, and an Executive Vice President. Defendant Gregory M. Glenn was Novavax's President of Research and Development. Defendant John A. Herrmann III was the Corporate Secretary, the Chief Legal Officer, and an Executive Vice President. Defendants Erck, Trizzino, Glenn, and Herrmann will be collectively referred to as "the Officer Defendants."

During the same time period, Novavax's Board of Directors included Defendants Erck, Gregg H. Alton, Richard H. Douglas, Margaret G. McGlynn, David M. Mott, Rachel K. King, Michael A. McManus, Jr., James F. Young, and Gary C. Evans. Evans concluded his service on the Board in June 2021. Defendants Erck, Alton, Douglas, McGlynn, Mott, King, McManus, Young, and Evans will be referred to collectively as "the Director Defendants."

The Board has four standing committees, including the Audit Committee, the Research and Development Committee ("the R&D Committee"), the Compensation Committee, and the Nominating and Corporate Governance Committee. The Audit Committee's responsibilities include overseeing Novavax's accounting and financial reporting processes; the preparation, presentation, and integrity of the financial reports and information provided to governmental and regulatory bodies and the public; the adequacy and efficacy of Novavax's systems of internal

accounting, auditing, and financial controls; and Novavax's compliance with applicable federal and state laws and regulations. The R&D Committee has responsibilities which include reviewing and assessing Novavax's R&D programs; evaluating Novavax's progress in achieving R&D goals and objectives; advising the Board on the scientific and R&D aspects of licensing, strategic partnerships, and acquisition or divestiture transactions; overseeing management's exercise of its responsibility to assess and manage risks associated with Novavax's R&D programs and regulatory matters; identifying and reporting to the Board on significant emerging scientific and technological developments; serving as a resource for management to consult on scientific and regulatory matters; and selecting, retaining, and supervising any advisors retained to further Novavax's R&D efforts. Young is the Chair of the R&D Committee and Douglass and Mott are members.

## II.     COVID-19 Vaccine Development

Prior to the onset of the COVID-19 pandemic in late 2019, Novavax was facing significant financial hardship. Novavax's attempts to develop vaccines for HIV, SARS, swine flu, and the Ebola virus were all unsuccessful. In mid-2019, Novavax sold all of its manufacturing facilities to stem financial losses. By March 2020, Novavax had only 127 employees. Novavax's shares traded at under $4.00 per share and, as a result, Novavax was at risk of being delisted from the NASDAQ stock exchange. At that point, Novavax had only enough cash to survive for another six months.

The onset of the COVID-19 pandemic in early 2020 provided Novavax with an opportunity to revive itself by finally developing a vaccine and bringing it to market. On February 26, 2020, Novavax announced that it was developing a COVID-19 vaccine, known as NVX-CoV2373 ("the Vaccine") using a proprietary technology. The development of the Vaccine was critical for the

company.   According to a market analyst, the Center for Financial Research and Analysis ("CFRA"), "the future financial success of [Novavax] and its ability to record a positive bottom-line [was] highly dependent on successful approvals and rapid commercialization of its COVID-19 vaccine."  Third Amended Complaint ("TAC") ¶ 66, ECF No. 52.

On June 4, 2020, Novavax announced that it had received an award of up to $60 million from the United States Department of Defense ("DOD") to manufacture the antigen component of the Vaccine and deliver 10 million doses of the Vaccine to DOD for use in clinical trials in 2020. On July 7, 2020, Novavax announced that it had been selected to participate in Operation Warp Speed, the federal government's program to develop and deliver a COVID-19 vaccine. Specifically, Novavax was awarded a $1.6 billion federal government grant to complete late-stage clinical development, establish large scale manufacturing, and deliver 100 million doses of the Vaccine as early as late 2020.  As a condition of the grant, Novavax was required to demonstrate that it could scale up manufacturing of the Vaccine.

Because Novavax did not have its own manufacturing facilities, on July 23, 2020, Novavax entered into an agreement with FUJIFILM Disoynth Biotechnologies ("FUJIFILM") to manufacture bulk drug substance for the Vaccine at facilities in College Station, Texas ("the Texas Facility") and Morrisville, North Carolina ("the North Carolina Facility").  As Trizzino stated in his February 2021 testimony before the U.S. House of Representatives, Committee on Energy and Commerce, Subcommittee on Oversight and Investigations, the antigen produced at the Texas and North Carolina Facilities was a "critical component" of Novavax's U.S. supply chain.  *Id.* ¶ 69.

Throughout the development and manufacturing process, Novavax was required to adhere strictly to United States Food and Drug Administration ("FDA") standards, including the FDA Current Good Manufacturing Practices ("cGMP") Regulations, which establish requirements to

4

ensure the proper design, monitoring, and control of manufacturing processes and facilities and the strength, quality, and purity of drug products. 21 C.F.R. §§ 210.1–211.208 (2022). In its 2020 SEC Form 10-K, Novavax acknowledged that, "[t]o supply products for use either in the U.S. or outside the U.S., including clinical trials, U.S. and foreign manufacturing establishments, including third-party facilities, must comply with GMP regulations and are subject to period[ic] inspection by the FDA or by corresponding regulatory agencies in their home country." TAC ¶ 78; Joint Record ("J.R.") 18, ECF No. 72.

Ultimately, Novavax sought to apply for and receive "Emergency Use Authorization" ("EUA") from the FDA for the Vaccine, TAC ¶ 72, which would permit the "introduction into interstate commerce" of a drug "intended for use in an actual or potential emergency" that is not yet "approved, licensed, or cleared for commercial distribution." 21 U.S.C. § 360bbb-3(a) (2018). In its 2020 Form 10-K, which was filed on March 1, 2021, Novavax stated that it planned to file an application for EUA from the FDA in the second quarter of 2021 and that it expected to be producing more than two billion doses per year by mid-2021.

## III.  Manufacturing Concerns

As it sought to develop the Vaccine, Novavax consistently faced manufacturing and production problems which caused delays in Novavax's filing of an EUA application. First, Novavax faced repeated contamination outbreaks at the Texas and North Carolina Facilities. According to Confidential Witness ("CW") 5, who was then FUJIFILM's Head of Technical Operations for Gene Therapy at the Texas Facility, there were multiple incidents of contamination at the Texas Facility beginning in December 2020, including four contamination incidents between December 2020 and March 2021. Each of these contamination incidents resulted in an investigation and the shutdown of manufacturing, ultimately delaying the manufacturing process,

with one in March 2021 causing a shutdown of manufacturing until September 2021. The first three of these contamination incidents involved bacterial contamination. According to CW 7, who was then the Manager of Quality Assurance at the North Carolina Facility, there were also multiple incidents of contamination at the North Carolina Facility between at least February 24, 2021 and October 19, 2021. CW 7 alleged that these incidents required employees to "dump the run" and restart the manufacturing process each time. TAC ¶ 111.

Novavax also faced difficulties meeting the purity and potency levels required by the FDA. According to CW 4, who was then the Novavax Senior Director of Clinical Operations, Novavax was unable to maintain the required level of potency and faced repeated manufacturing delays "off and on" throughout 2021 due to issues with "lesser potency" and the "stability" of the Vaccine. *Id.* ¶¶ 113, 114.

Furthermore, Novavax struggled to successfully scale up production of the Novavax Vaccine. According to CW 4, Novavax struggled to produce enough vaccine doses for various clinical trials, including approximately 4,000 doses needed for three clinical trials in 2021, which resulted in delay of the trials. CW 4 also alleged that Novavax continued to schedule new clinical trials despite the fact that Novavax was unable to provide enough doses for the existing trials.

Novavax also faced persistent supply chain issues and raw material shortages. According to CW 6, who was then the Director of Manufacturing at the Texas Facility, supply chain constraints and difficulties obtaining certain materials "were always a struggle." *Id.* ¶ 122. For example, CW 7 alleged that Novavax had difficulty procuring the components necessary to manufacture the Vaccine, such as filters and resin used in the manufacturing process. CW 5 alleged that Novavax had problems obtaining blades used in the manufacturing process.

According to CW 7, these supply chain issues impacted Novavax for the entire duration of the development of the Vaccine.

## IV.    FDA Inspections

The FDA uncovered many of these manufacturing issues during inspections of the Texas and North Carolina Facilities. Between March 15, 2021 and March 19, 2021, the FDA inspected the Texas Facility. After the inspection, the FDA issued a report, identifying several "items of concern," including that:

- Quality oversight over manufacturing and testing operations is sub-optimal. We identified several examples where deviations were not detected and documented appropriately and where change controls were not opened when appropriate.

- Manufacturing areas were cleaned using disinfectants that "failed one or more microbial log reduction acceptance" tests and the "[c]leaning procedure for the classified manufacturing areas was not always followed."

- Warehouse areas used for storage of cGMP materials were "overcrowded and poorly organized."

*Id.* ¶ 86.

Between April 14, 2021 and April 21, 2021, the FDA inspected the North Carolina Facility.

After the inspection, the FDA issued a report identifying several items of concern, including that:

- Microbial control of the facility was inadequate [because] the facility's employees failed to investigate root causes and implement adequate corrective and preventative actions to control microbial contamination, as exemplified by the FDA learning from prior reports that microbial contamination was recovered from over 50 monitoring sites—including in purification sites.

- There was no comprehensive risk assessment conducted to evaluate cross-contamination of drug products, including where such drug products were manufactured in the same areas with shared product contact equipment.

- The manufacturing process was not adequately monitored and/or controlled to ensure the quality of the drug substance was not adversely affected.

- Written procedures for manufacturing processes were inadequate, including inadequate procedures for the "Purification" step.

- Discrepancies were not fully investigated to identify a root cause and corrective and preventative actions were not adequately implemented to prevent recurrence.

- Procedures of material management systems were not followed or were inadequate, which led to expired materials being found in the warehouse.

*Id.* ¶ 87.

The FDA inspected the Texas Facility for a second time in August 2021. Following this second inspection, the FDA issued an FDA Form 483 in which it identified various deficiencies, including that:

- There were inadequate controls to prevent cross-contamination of other products in the multiproduct facility.

- There was a failure to adequately investigate batch contaminations.

- There was a failure to comply with the existing contamination control strategy.

- Employees were not adequately trained for bulk substance manufacturing.

- There were no quantitative or specific measurements taken to qualify equipment used in bulk drug substance manufacturing.

- There was a lack of policies and procedures to appropriately test materials from outside sources.

- There was a lack of reviews or corrective maintenance to assess whether plans needed to be changed or to determine the need for re-qualification of equipment, utilities, or facilities.

*Id.* ¶ 88.

## V.  Knowledge of Manufacturing Problems

Plaintiffs allege that Novavax generally and Defendants specifically were aware of the manufacturing problems related to contamination, purity, potency, scalability, and the supply chain, particularly the issues at the Texas and North Carolina Facilities. The Board received

periodic updates about the manufacturing of the Vaccine and the various manufacturing issues facing Novavax. For example, at the Board meeting on March 18, 2021, Novavax management provided an Operations Update that included information on the Vaccine manufacturing process, including updates on potency issues, contamination incidents, raw material shortages, the production schedule and associated risks, and efforts to obtain regulatory approval. At its meeting, the Board also received updates on the Vaccine's clinical trials and their results.

At its June 17, 2021 meeting, the Board received another Operations Update, which included information on issues related to production of the Vaccine, such as purity and potency problems, contamination at facilities, and shortages of necessary materials. At its meeting on June 18, 2021, the Board continued to discuss production of the Vaccine and voted to approve securing the use of the Texas Facility for Vaccine production during 2022. At a June 26, 2021 Board meeting, the Board received information about one of its clinical trials and a related crossover study and voted to approve a modification of an existing contract to support that study. At a July 17, 2021 Board meeting, the Board received information on means by which to obtain additional raw materials and approved two agreements with other entities for the procurement of additional raw materials. Finally, the Board received another Operations Update at its September 16, 2021 Board meeting which included information on Vaccine purity issues, contamination issues, and risks associated with raw materials.

On several occasions, because of these issues, Novavax announced to investors that it intended to delay its application for EUA. For example, on May 10, 2021, Novavax held an earnings call in which it disclosed to investors and analysts that it was unlikely to seek EUA until the third quarter of 2021, specifically July 2021 at the earliest. Similarly, on August 5, 2021, Novavax disclosed that it did not intend to apply for EUA until the fourth quarter of 2021.

## VI.   **2021 Proxy Statement**

The Third Amended Complaint alleges that there were a number of material misrepresentations or omissions in Novavax's 2021 Proxy Statement which was issued on May 3, 2021. In the Proxy Statement, the Board solicited shareholder votes on a number of proposals, including proposals to provide an advisory vote approving executive officer compensation paid in 2020 ("Proposal 2"), to ratify April 2020 equity awards to certain Novavax officers and employees ("Proposal 4"), and to ratify June 2020 equity awards to certain Novavax directors, officers, and employees ("Proposal 5").

As to Proposal 2, the Board requested that shareholders vote on an advisory, non-binding resolution to approve the compensation paid in 2020 to Erck, Glenn, Trizzino, Herrmann, and former Novavax Chief Financial Officer Gregory Covino.

As for Proposals 4 and 5, the Board sought shareholder approval of "resolutions ratifying two sets of equity awards made in April 2020 and June 2020." J.R. 301. As detailed in the Proxy Statement, on April 17, 2020 and April 18, 2020, the Board's Compensation Committee approved "equity-based awards covering 2,827,650 shares to employees, including certain members of senior management, in the U.S. and Sweden in recognition of the extraordinary work of Novavax employees to implement a new vaccine program against [COVID-19] and to incentivize the additional work necessary to make the program successful." ("the April 2020 Awards"). J.R. 302. On June 25, 2020, the Compensation Committee granted additional awards ("the June 2020 Awards") consisting of "options to purchase shares of Common Stock and time-vesting restricted stock units" to all but one of the non-employee directors then in office and "time-vesting restricted stock units to two executive officers and seven non-executive employees, as well as a time-vesting option to purchase shares of Common Stock to a non-executive employee." J.R. 304.

10

As disclosed in the Proxy Statement, the April 2020 Awards and the June 2020 Awards were challenged by Novavax shareholder Thomas Golubinski through a derivative action filed in a Delaware court. In his complaint, Golubinski alleged that the April 2020 Awards were unlawful, in part, because they were "spring-loaded" in that they were granted prior to the release of material information reasonably expected to result in an increase in the share price, that the recipients of the shares breached their fiduciary duties by accepting the awards and were unjustly enriched, and that the directors breached their fiduciary duties and committed waste by granting the awards. *Id.* Golubinski alleged that the June 2020 Awards were likewise improper, in part, because they were spring-loaded, the recipients were therefore unjustly enriched, and the directors breached their fiduciary duties and committed waste by granting and accepting the awards. Through the Proxy Statement, the Board solicited shareholder ratification of the awards which would provide a basis to seek dismissal of Golubinski's lawsuit.

On June 24, 2021, Novavax filed an SEC Form 8-K disclosing in relevant part that Proposals 4 and 5 were adopted by the shareholders.

**VII.     Stock Sales**

The Amended Complaint further alleges that eight Defendants improperly engaged in the sale of over $87 million their own shares of Novavax stock based on material, nonpublic information that when disclosed after those sales resulted in a drop in the Novavax share price. In particular, Plaintiffs allege that two directors, McManus and Young, engaged in such sales shortly after the March 18, 2021 Board meeting at which the Board was informed of adverse information about the development of the Vaccine. Specifically, the Board was made aware at the March 18, 2021 Board meeting that Novavax was experiencing potency issues, contamination incidents, and raw material shortages. On March 19, 2021, McManus sold 4,000 shares of Novavax stock, at a

share price of $220.78, earning $883,110 in proceeds. On March 23, 2021, Young sold 10,000 shares of Novavax stock, at a share price of $228.22, earning $2,282,230.78 in proceeds. On May 10, 2021, Novavax held an earnings call and disclosed to investors and analysts that it was unlikely to seek EUA until July 2021 at the earliest. On May 11, 2021, the share price dropped by 21 percent over two days to $138.18.

Plaintiffs also allege that two other directors, Mott and Erck, engaged in such sales shortly after the September 16, 2021 Board meeting at which the Board was informed of additional adverse information about the Vaccine development. In particular, directors were made aware at the September 16, 2021 Board meeting that Novavax continued to face purity and potency issues, contamination incidents, and raw material shortages. On September 23, 2021, Mott sold 24,961 shares of Novavax stock, at a share price of $252.90, earning $6,312,616.20 in proceeds. On October 1, 2021, Erck sold 49,000 shares of Novavax stock, at a share price of $175.10, earning $8,580,063.84 in proceeds. Then, on October 4, 2021, Erck sold 42,829 shares of Novavax stock, at a share price of $176.15, earning $7,544,194.71 in proceeds. On October 19, 2021, *Politico* published an article, described in detail below, disclosing the various manufacturing challenge faced by Novavax and alerting the public that Novavax was still a year away from achieving regulatory approval. On October 20, 2021, the Novavax share price fell by 14 percent to $136.86.

Plaintiffs also allege that several of the Officer Defendants engaged in stock sales in reliance on material nonpublic information. In particular, on April 15, 2021, one month after the March 18, 2021 Board meeting at which Glenn, Hermann, and Trizzino were present, Glenn sold 5,712 shares of Novavax stock, at a share price of $200.35, earning $1,144,387.39 in proceeds. On April 19, 2021, Glenn sold 2,417 shares of Novavax stock, at a share price of $219.72, earning $531,051.77 in proceeds. On April 30, 2021, Herrmann sold 2,895 shares of Novavax stock, at a

12

share price of $239.83, earning $694,317.13 in proceeds. As discussed above, on May 10, 2021, Novavax announced that it was unlikely to seek EUA from the FDA until July 2021. On May 11, 2021, the share price fell by 21 percent over two days to $138.18.

## VIII.  *Politico* **Article**

On October 19, 2021, *Politico* published an article entitled, "They rushed the process: Vaccine maker's woes hamper global inoculation campaign," which revealed the underlying, undisclosed manufacturing problems that had been preventing Novavax from filing its EUA application with the FDA and alerted investors for the first time that Novavax's timeline for approval was still another year away. TAC ¶¶ 168–70. Specifically, the article reported that Novavax faced "significant hurdles in proving it can manufacture a shot that meets regulators' quality standards." *Id.* ¶ 168. For example, it detailed Novavax's failure to reach anywhere close to the 90 percent purity level required by the FDA. It also stated that senior government officials affiliated with Operation Warp Speed repeatedly warned Novavax that it "risked running into problems in scaling up the manufacturing" of the Vaccine and that Novavax "would have difficulty ensuring that the vaccine consistently met the FDA's rigorous quality standards once the vaccine went into mass production." *Id.* ¶ 170. On October 20, 2021, the day after the publication of this article, Novavax's stock price fell 14 percent to $136.86 per share.

## IX.  **Procedural History**

On November 22, 2021, the first Complaint in this action was filed as a derivative action on behalf of Novavax in *Meyer v. Erck*, No. TDC-21-2996. Similar complaints were filed on June 10, 2022 in *Snyder v. Erck*, No. TDC-22-1415, and in *Blackburn v. Novavax, Inc.*, No. TDC-22-1417. After the cases were consolidated on October 6, 2022, Plaintiffs filed the currently operative Third Amended Complaint in which they allege the following causes of actions in the following

numbered counts: (1) a violation of Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), based on knowingly false statements and material omissions in the Proxy Statement, including statements relating to the proposed ratification of the April 2020 Awards and June 2020 Awards, in violation of SEC Rule 14a-9 and 17 C.F.R. § 240.14a-9; (2) breach of fiduciary duty based on the Director Defendants' allegedly inadequate oversight of the development of the Vaccine; (3) breach of fiduciary duty arising from the sales of stock by certain Defendants based on adverse, material nonpublic information; and (4) unjust enrichment arising from the sales of stock based on adverse, material nonpublic information.

## DISCUSSION

In their Motion, Defendants seek dismissal under Federal Rules of Civil Procedure 12(b)(6) and 23.1, on the grounds that (1) plaintiffs have failed to allege with particularity that demand would have been futile under Rule 23.1; and (2) the Third Amended Complaint fails to state a plausible claim for relief.

## I.     Legal Standards

To defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Ordinarily on a Rule 12(b)(6) motion, the Court considers only the allegations in the complaint and its attachments. Fed. R. Civ. P. 12(d); *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Courts are permitted to consider documents attached to a motion to dismiss "when the document is integral to and explicitly relied on in the complaint, and when the plaintiffs do not challenge the document's authenticity." *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015) (quoting *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004)). Here, Defendants have submitted, within a Joint Record, exhibits including the Proxy Statement, Board meeting minutes, and Board presentations on the Vaccine development that are referenced in the Third Amended Complaint. Where these documents are integral to the complaint and Plaintiffs have not objected to their authenticity, the Court will consider them. *See Sec'y of State for Defence*, 484 F.3d at 705; *Zak*, 780 F.3d at 606–07. The Court will not, however, consider the remaining exhibits within the Joint Record. *See Zak*, 780 F.3d at 607 (finding that the district court erred in considering SEC filings relating to stock sales at the motion-to-dismiss stage because the filings were not integral to the complaint).

## II.   Demand Futility

Defendants first argue that the claims should be dismissed because Plaintiffs failed to make a pre-suit demand upon Novavax's Board of Directors to remedy the alleged harm to Novavax. Federal Rule of Civil Procedure 23.1 requires that plaintiffs bringing shareholder derivative actions "state with particularity:  (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3). This rule is known as the pre-suit demand requirement. Because Novavax is incorporated in Delaware,

this Court turns to Delaware law to determine whether the Plaintiffs needed to make a pre-suit demand or whether there were sufficient reasons for not doing so. *See Garnitschnig v. Horovitz*, 48 F. Supp. 3d 820, 829 (D. Md. 2014).

"A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation." *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984). Managing the corporation's affairs includes bringing lawsuits on the corporation's behalf. *Id.* at 811–12. Where a shareholder derivative suit "allows a shareholder to initiate action on behalf of a corporation," shareholders seeking to bring a derivative suit must "first make[] a demand upon the board with respect to [the] claim or, in the alternative, demonstrate[] that it would be futile to do so." *Garnitschnig*, 48 F. Supp. 3d at 830.

Shareholders may establish the futility of making a pre-suit demand based on the factors set forth in *United Food & Commercial Workers Union v. Zuckerberg*, 262 A.3d 1034 (Del. 2021). Plaintiffs must plead with particularity that at least half of the directors who would have considered the demand to file suit were not disinterested and independent. *Id.* at 1059. In determining whether a director was disinterested and independent, the Court must consider whether the director: (1) received a material personal benefit from the alleged misconduct; (2) faced a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; or (3) lacked independence from someone who received a material personal benefit or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand. *Id.* If one or more of these conditions exists for at least half of the members of the Board of Directors, demand is excused as futile. *Id.* Notably, in demonstrating that demand was futile, derivative action plaintiffs must meet stringent requirements of factual particularity that differ substantially from permissive notice pleadings. *Id.* at 1048.

16

In evaluating whether a director faces a substantial likelihood of liability, the "mere threat of personal liability" is insufficient. *Aronson*, 473 A.2d at 815. Plaintiffs must "make a threshold showing, through the allegation of particularized facts, that their claims have some merit." *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993). However, Plaintiffs are not required to demonstrate a "reasonable probability of success" on the claim. *See id.* (finding that such a requirement would impose an "extremely onerous burden" at the pleading stage). Here, Plaintiffs allege that at least half of the directors were not disinterested and independent because they either received a material personal benefit from the alleged insider trading or they face a substantial likelihood of liability on the claims for a violation of Rule 14a-9 or a breach of fiduciary duty.

### A.    Rule 14a-9

Plaintiffs argue that demand was futile because there is a substantial likelihood of liability on its claim under the Exchange Act that Defendants violated SEC Rule 14a-9, which provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9. To sustain a claim based on Rule 14a-9, Plaintiffs must allege that: (1) "the proxy statement contained a material misrepresentation or omission"; (2) the misrepresentation or omission caused the plaintiff's injury; and (3) "the proxy solicitation was an essential link in the accomplishment of the transaction." *Karp v. First Connecticut Bancorp, Inc.*, 69 F.4th 223, 231 (4th Cir 2023). A complaint alleging a material omission must allege that the omitted fact was "necessary in order to make the statements" in the proxy statement "not false or misleading." *In re Willis Towers Watson PLC Proxy Litig.*, 937 F.3d 297, 306–07 (4th Cir. 2019).

For purposes of Rule 14a-9, "[a] fact is material if there is a substantial likelihood that the disclosure of the fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Karp*, 69 F.4th at 232. Thus, an omitted fact is material if it is substantially likely "that a reasonable shareholder would consider it important in deciding how to vote." *Id.*

In their memorandum in opposition to the Motion to Dismiss, Plaintiffs' argument for a finding of demand futility on the Rule 14a-9 cause of action is limited to the claim that alleged material omissions in the Proxy Statement relating to Proposals 4 and 5, for the ratification of the April 2020 and June 2020 Awards, demonstrate a substantial likelihood of liability. The Proxy Statement described the April 2020 Awards as follows:

> At meetings held on April 17 and April 18, 2020, the Compensation Committee approved equity-based awards covering 2,827,650 shares to employees, including certain members of senior management, in the U.S. and Sweden in recognition of the extraordinary work of Novavax employees to implement a new vaccine program against [COVID-19] and to incentivize the additional work necessary to make the program successful.

J.R. 302. The Proxy Statement described the June 2020 awards as follows:

> [T]he Compensation Committee granted options to purchase shares of Common Stock and time-vesting restricted stock units to non-employee directors then in office . . . [and] also granted time-vesting restricted stock units to two executive officers and seven non-executive employees, as well as a time-vesting option to purchase shares of Common Stock to a non-executive employee.

J.R. 304. The Proxy Statement stated that these awards had been challenged by Golubinski in a derivative action based on the claims that they were spring-loaded and that the directors committed waste and breached their fiduciary duties by granting and accepting them, and it requested that the Board vote to ratify the awards in order to provide a basis to dismiss that action.

Plaintiffs also argue that the following language in the section of the Proxy Statement relating to Proposal 2, which sought an advisory vote on the executive compensation paid by the company for 2020, was materially misleading as to Proposals 4 and 5:

> The Compensation Committee believes that the 2020 compensation of all our employees, including our Named Executive Officers, is appropriate not only due to the achievement of critical milestones under exceedingly difficult conditions, but also because it serves to continue to encourage their extraordinary efforts towards the achievement of our key priorities and anticipated milestones in 2021 and beyond.  Over the past year, we leveraged our years of vaccine expertise to help global health authorities address, control and eradicate the [COVID-19] virus.

J.R. 268.

Plaintiffs allege that these statements were misleading because they omitted material facts about the ongoing problems with development of the Vaccine.  In particular, Plaintiffs allege that the language in the Proxy Statement was misleading because it touted the "extraordinary work" of Novavax employees to implement a new vaccine program, J.R. 302, and the "achievement of critical milestones," J.R. 268, while omitting the facts showing that Novavax was facing significant obstacles to manufacturing the Vaccine and obtaining regulatory approval, including contamination issues at the Texas and North Carolina Facilities, potency issues, and raw material shortages.  The Proxy Statement also omitted the facts that the FDA had identified and documented many of these quality-related problems during inspections, that the Texas Facility's manufacturing process was shut down at the time of the issuance of the Proxy Statement, and that the schedule for obtaining regulatory approval was in jeopardy.  Plaintiffs further argue that the Proxy Statement improperly omitted the fact that, as claimed by Plaintiffs, the Board was not adequately overseeing the Vaccine development or regulatory compliance.

Although these facts about challenges to the development of the Vaccine were troubling, they were not material to Proposals 4 and 5 relating to the April 2020 and June 2020 Awards.

19

Those proposals sought shareholder ratification of decisions already made in April 2020 and June 2020. The shareholders were being asked to consider the propriety of the Board's decisions at those times to award the options to purchase stock to certain directors, officers, and employees based on their work up until April and June 2020 on the Vaccine development and thus to incentivize them to stay with Novavax and continue with that work. To some extent, they were also asked to evaluate whether Golubinski's criticisms of the form and amount of the awards were valid. As of April 2020, Novavax had just begun its Vaccine development program, which was a critical project to keep Novavax viable as a company. By June 2020, it had received a $60 million grant from DOD in support of its work. The statement about the "extraordinary work of Novavax employees to implement a new vaccine program" is only fairly read as characterizing the work up to April 2020 and June 2020. J.R. 302.

As for Plaintiffs' focus on the reference to "achievement of critical milestones," *id.* at 268, that statement was contained in a separate section of the Proxy Statement from the discussion about Proposals 4 and 5 and cannot fairly be read as part of the justification for the ratification vote, which was focused on specific actions in April 2020 and June 2020 and the specific objections by Golubinski. Even if it could be construed as relevant, the statement was made as part of the discussion of the reasons for the compensation given to Novavax executives for 2020, so the claim about achievement of milestones can only be read as a statement that the company's progress remained on track during 2020, a claim which has not been refuted.

Rather, the first manufacturing issues did not arise until December 2020, when the Texas Facility experienced its first contamination incident, and most of the challenges that Plaintiffs identify as material omissions did not occur until 2021. Where the Proxy Statement requested that shareholders ratify decisions to grant compensation awards made in April 2020 and June 2020

based on performance and expectations at those times, facts about specific challenges faced in 2021, that had not occurred and were not expected back in April 2020 and June 2020, were not the kind of information that would have "significantly altered the total mix of information" and that a "reasonable shareholder would consider . . . important in deciding how to vote" on the ratification. *Karp*, 69 F.4th at 232. Because the Proxy Statement ultimately asked shareholders to vote on whether the claims alleged in Golubinski's complaint affected the propriety of the awards, manufacturing issues that arose well after the awards were granted in April 2020 and June 2020 were not material to the statements in the Proxy Statement soliciting ratification of the awards. *See* 17 C.F.R. § 240.14a-9(a) (noting that representations in a proxy statement must have been false or misleading "at the time and in light of the circumstances under which" they were made). Plaintiffs have thus not sufficiently alleged that the Director Defendants face a substantial likelihood of liability for violations of Rule 14a-9, so demand was not futile as to Plaintiffs' Rule 14a-9 claim.

### B.    Breach of Fiduciary Duty: *Caremark*

Plaintiffs are alleging that Defendants engaged in two different breaches of their fiduciary duties to Novavax. First, they allege a breach of fiduciary duty pursuant to *In re Caremark International Inc. Derivative Litigation*, 698 A.2d 959 (Del. Ch. 1996), under which directors have a duty to attempt in good faith to ensure that "information and reporting systems exist in the organization that are reasonably designed to provide to senior management and to the board itself timely, accurate information sufficient to allow management and the board, each within its scope, to reach informed judgments concerning both the corporation's compliance with law and its business performance." *Id.* at 970. To satisfy this duty of loyalty, directors must make a good faith effort to implement such a reasonable, board-level compliance and oversight system and then

monitor it. *Marchand v. Barnhill*, 212 A.3d 805, 821 (Del. 2019).   In order to state a claim for a breach of fiduciary duty under *Caremark*, plaintiffs must sufficiently allege that: (1) "the directors utterly failed to implement any reporting or information systems or controls"; or (2) "having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 370 (Del. 2006).   Imposition of liability requires a finding that the directors knew that they were not discharging their fiduciary obligations. *Id.*   "Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith."   *Id.*

### 1.    Implementation of Systems and Controls

As to the requirement that Plaintiffs allege with particularity that the directors "utterly failed to implement any reporting or information system or controls," *id.*, this prong does not require the examination of "the effectiveness of a board-level compliance and reporting system after the fact." *Marchand*, 212 A.3d at 821.   Rather, the critical question is whether the board undertook "good faith efforts to put a board-level system of monitoring and reporting in place." *Id.*   Here, Plaintiffs allege that the Director Defendants failed to implement any reporting or information systems and controls related to the development of the Vaccine, because (1) there was no Board committee specifically tasked with overseeing manufacturing, contract development and manufacturing organizations ("CDMOs"), compliance with the cGMPs, or product manufacturing quality and safety; (2) there were no formal processes or controls requiring management to keep the Board informed of manufacturing safety practices, risks, or reports; (3) there was no schedule for the Board to consider on a regular basis the existence of any manufacturing safety risks; (4)

the audit reports identifying deficiencies were not reviewed by or disclosed to the Board; (5) there was no discussion by the Board about product manufacturing quality and safety; and (6) the Board did not review reports by its quality consultant or the FDA evidencing gross deficiencies at Novavax's CDMOs.

Although the parties disagree on whether such information and reporting systems were established through the Audit Committee and the R&D Committee, the Court need not address that issue because it finds that the Board itself served that function. As reflected in the presentations to the Board and the Board's meeting minutes, the full Board of Directors regularly received substantial updates from management on the manufacturing and development of the Vaccine. In particular, the Board was regularly informed about a wide variety of issues affecting the development of the Vaccine—including potency issues, raw material shortages, contamination incidents, and obstacles to achieving regulatory approval—at numerous Board meetings, including on March 18, 2021, June 17, 2021, June 18, 2021, June 26, 2021, July 17, 2021, and September 16, 2021. Presumably because the Vaccine was Novavax's main product and the focus of its business during the relevant time period, the Operational Updates provided to the Board were highly detailed. *See* J.R. 115–51, 118–19, 132, 133–35, 137, 157, 525, 528, 531, 534, 535, 538, 556, 558, 561–62, 763, 765. For example, in the March 18, 2021 Operations Update, the Board was informed that Novavax was facing potency issues, including difficulties standardizing particle size and potency across batches; raw material shortages, including shortages of Cytiva bioreactor bags and accessories, Millipore Clarisolves depth filters, and nanofilters; and contamination incidents, including contamination at the Texas Facility; and that Novavax's chemistry, manufacturing, and controls submissions to the FDA were delayed because of the potency issues. Similarly, in the June 17, 2021 Board Operations Update, the Board was informed that Novavax

continued to face potency and purity issues, including particle size concerns, overly potent batches, and significant impurities; contamination incidents, including multiple contaminations at the Texas Facility; and raw material shortages, including shortages of filters.  Such regular reporting to and monitoring by the full Board, particularly at this level of granularity, can constitute the kind of board-level compliance and reporting system required under *Caremark*.  *See Genworth Fin. Inc. Consol. Deriv. Litig.*, No. 11901-VCS, 2021 WL 4452338, at *14 (Del. Ch. Sept. 29, 2021) (dismissing a *Caremark* claim where the Board as a whole "was informed throughout" the relevant time period); *In re GoPro, Inc.*, No. 2018-0784-JRS, 2020 WL 2036602, at *12 n.152 (Del. Ch. Apr. 28, 2020) (granting a Rule 23.1 motion to dismiss in part because "the Board writ large regularly reviewed" certain issues "with the assistance of Company management").

Notably, allegations that the Board developed inadequate reporting or information systems or controls do not give rise to a *Caremark* claim.  *Marchand*, 212 A.3d at 821 (stating that the question is not "the effectiveness of a board-level compliance and reporting system" but whether a Board of Directors failed to "undertake good faith efforts" to put such a system in place). Thus, Plaintiffs' allegations that the Board was not supervising specific aspects of the Vaccine development, such as issues relating to CDMOs or compliance with cGMPs, at most create questions about the effectiveness of the Board's oversight.  In light of the record reflecting that the Board consistently received detailed updates on a broad range of issues impacting the development of the Vaccine, Plaintiffs' allegations do not support the conclusion that the Board "utterly failed to implement any reporting or information system or controls."  *Stone ex rel. AmSouth Bancorp.*, 911 A.2d at 370; *Genworth Fin. Inc. Consol. Deriv. Litig.*, 2021 WL 4452338, at *14; *In re GoPro, Inc.*, 2020 WL 2036602, at *12.  Accordingly, the Court finds that Plaintiffs have not sufficiently pleaded the first prong of a *Caremark* claim.

### 2. Monitoring of Systems and Controls

Alternatively, Plaintiffs argue that it may succeed on its *Caremark* claim via the second prong, based on allegations that even with a compliance and reporting system, Defendants consciously failed to monitor or oversee that system and thereby "disabl[ed] themselves from being informed of risks or problems requiring their attention." *Stone ex rel. AmSouth Bancorp.*, 911 A.2d at 370. Generally, such a *Caremark* claim involves a conscious failure to act after learning about "evidence of illegality." *South v. Baker*, 62 A.3d 1, 15 (Del. Ch. 2012); *La. Mun. Police Emps. Ret. Sys. v. Pyott*, 46 A.3d 313, 340–41 (Del. Ch. 2012). Because "[t]here are significant differences between failing to oversee employee fraudulent or criminal conduct and failing to recognize the extent of a Company's business risk," "the mere fact that a company takes on business risk and suffers losses—even catastrophic losses—does not establish misconduct, and without more, is not a basis for personal director liability." *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 130–31 (Del. Ch. 2009). Although corporate directors may be held liable for failing to monitor and address issues that do not involve a violation of positive law, such liability requires a showing of bad faith and thus may be imposed only in rare circumstances. *See Constr. Indus. Lab. Pension Fund v. Bingle*, No. 2021-0940-SG, 2022 WL 4102492, at *7 (Del. Ch. Sept. 6, 2022) ("[I]t is possible . . . to envision an extreme hypothetical involving liability for bad faith actions of directors leading to . . . liability" based "solely on the failure to monitor business risk."); *Firemen's Ret. Sys. of St. Louis on behalf of Marriott Int'l, Inc. v. Sorenson*, No. 2019-0965-LWW, 2021 WL 4593777, at *12 (Del. Ch. Oct. 5, 2021) (finding that, although the failure to monitor cybersecurity could, under some circumstances, give rise to *Caremark* liability, plaintiffs failed to allege a viable *Caremark* violation based on the defendant directors' failure adequately to oversee the company's cybersecurity risks).

In *In re Citigroup*, the court rejected a *Caremark* claim under the second prong based on the allegations that the Board of Directors should be liable for a breach of fiduciary duty for failing to address "red flags" signaling a deterioration in the subprime mortgage market that led to significant financial losses because "[t]o recognize such claims under a theory of director oversight liability would undermine the long established protections of the business judgment rule." 964 A.2d at 129–30. Here, Plaintiffs have advanced no allegations that the Director Defendants were made aware of any violations of positive law. Rather, Plaintiffs allege that the Board's oversight was inadequate because it knew of, but failed adequately to respond to, adverse information about the Vaccine development program, such as that the Vaccine did not meet the FDA's potency requirements, there were multiple incidents of contamination, there were raw material shortages, and these issues were all delaying the Vaccine's development. Although, as discussed above, a *Caremark* claim arguably could be based on a failure to engage in oversight that led to a "corporate trauma" or caused "significant financial liability," Delaware courts have, as a practical matter, routinely rejected such claims in the absence of violations of the law, evidence of bad faith, or a basis to find that the Board's actions or inactions led to that harm. *Reiter on Behalf of Cap. One Fin. Corp. v. Fairbank*, No. 11693-CB, 2016 WL 6081823, at \*13 (Del. Ch. Oct. 18, 2016) (finding no substantial likelihood of liability on a *Caremark* claim where none of the "red flag" reports about compliance risk presented to the Board concluded that the company violated statutory requirements at any time or that anyone within the company had engaged in fraudulent or criminal conduct); *see In re Geron Corp. S'holder Deriv. Litig.*, No. 2020-0684-SG, 2022 WL 1836238, at \*13 (Del. Ch. June 3, 2022) (finding no substantial likelihood of liability on a *Caremark* claim based on the allegation that the Board of Directors failed to fulfill its oversight duties when it was aware of the failure of clinical trials, where there was no allegation that there was any violation of

positive law or regulations, or that there was any basis to conclude that the Board's action or inaction could have led to a different result); *Firemen's Ret. Sys. of St. Louis on behalf of Marriott Int'l, Inc.*, 2021 WL 4593777, at *15–17 (finding no substantial likelihood of liability on a *Caremark* claim where the complaint alleged that the Board ignored red flags about inadequate data protection systems and did not discontinue the use of a reservation system infected with malware, but there was no known illegal conduct, lawbreaking, or violations of a regulatory mandate). Where the Board's alleged failure to engage in sufficient oversight would constitute a failure to address business risk, not a failure to address illegal conduct, and Plaintiffs have not alleged facts showing bad faith and sufficiently connecting the alleged lack of oversight to the corporate trauma, the Court finds that there is not a substantial likelihood that the Director Defendants would be liable under the second prong of *Caremark*. *See In re Citigroup*, 964 A.2d at 131. The Court therefore finds that demand was not futile as to the *Caremark* claim.

## C.    Breach of Fiduciary Duty:  Insider Trading

Plaintiffs also argue that demand was futile on its breach of fiduciary duty and unjust enrichment claims relating to alleged insider trading. Under *Brophy v. Cities Service Co.*, 70 A.2d 5 (Del. Ch. 1949), Delaware law provides that there is a breach of fiduciary duty when an individual with such a duty to a company uses information that was confidentially acquired during the course of or on account of the fiduciary relationship for personal gain. *Id.* at 7–8. To prevail on a *Brophy* claim, plaintiffs must show that: (1) "the corporate fiduciary possessed material, nonpublic company information"; and (2) "the corporate fiduciary used that information improperly by making trades" because the fiduciary was "motivated, in whole or in part, by the substance of that information." *Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831, 838 (Del. 2011). Here, Plaintiffs allege that Director Defendants Erck, Mott, McManus, and Young

27

relied on confidential information related to the problems with the development of the Vaccine, received in their role as directors, in making profitable sales of Novavax stock before that information became public and caused the stock price to fall.  Specifically, they assert that McManus and Young, after receiving material nonpublic information about Novavax's ongoing challenges in producing the Vaccine at the Board meeting on March 18 2021, sold shares only days later, on March 19, 2021 and March 23, 2021, respectively.  Likewise, they assert that Mott and Erck, after receiving similar material nonpublic information at the Board meeting on September 16, 2021, sold shares within two to three weeks, on September 23, 2021, October 1, 2021, and October 4, 2021.

### 1.    Material, Nonpublic Information

Confidential information is material if there is a "substantial likelihood that, under all the circumstances, it would have assumed actual significance in the deliberations" of a reasonable shareholder deciding whether to trade stock.  *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985).  As discussed above, on March 18, 2021, the Board received a detailed Operations Update which demonstrated that Novavax faced several obstacles in developing the Vaccine, including potency concerns, contamination at the manufacturing facilities, and raw material shortages.  *See supra* part II.B.1.  The Board was also informed that Novavax's chemistry, manufacturing, and controls submissions to the FDA were delayed because of the potency issues.  This and other information, which impacted Novavax's ability successfully to produce the Vaccine and obtain regulatory approval on its targeted timeline, could fairly be deemed to have "assumed actual significance in the deliberations" of a person deciding whether to trade stock.  *Rosenblatt*, 493 A.2d at 944; *see In re Fitbit, Inc. Stockholder Deriv. Litig.*, No. 2017-0402-JRS, 2018 WL 6587159, at *12–13 (Del. Ch. Dec. 14, 2018) (finding that a product's technology problems and

28

the company's inability to fix them constituted material, nonpublic information).  Thus, Plaintiffs have plausibly alleged that McManus and Young had material nonpublic information when they sold their shares only days after the Board meeting, on March 19, 2021 and March 23, 2021, respectively.

Similarly, on September 16, 2021, the Board received another detailed Operations Update on manufacturing obstacles, including ongoing potency and contamination problems and raw material shortages.  These concerns included batches with low purity levels, production holds due to "gel flakes found in the lipid solution," J.R. 766, delays in the delivery of reactors, and contamination at the Texas Facility.  Again, such information can fairly be construed as the type of information that would factor into an investor's decision to trade Novavax stock.  *Rosenblatt*, 493 A.2d at 944; *In re Fitbit, Inc. Stockholder Deriv. Litig.*, 2018 WL 6587159, at *12–13. Accordingly, Plaintiffs have fairly alleged that Mott and Erck possessed material, nonpublic information at the time that they sold Novavax stock in the weeks following the September 16, 2021 Board meeting.

### 2.    Improper Use

In assessing whether a trade by a fiduciary was improper because it was "motivated, in whole or in part, by the substance of" material nonpublic information, *Kahn*, 23 A.3d at 838, the fact that a trade occurred near the time of the receipt of the information is probative evidence on the seller's motive.  *See In re Clovis Oncology, Inc. Deriv. Litig.*, No. 2017-0222-JRS, 2019 WL 4850188, at *15 (Del. Ch. Oct. 1, 2019).  Typically, however, courts require more than temporal proximity and also consider whether the sales were normal and routine and the size of the trade relative to the defendant's overall stock holdings and ordinary compensation.  *In re Suprema*

*Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277 (3d Cir. 2006); *In re Primedia, Inc. S'holders Litig.*, No. 6511-VCL, 2013 WL 6797114, at *14 (Del. Ch. Dec. 20, 2013).

Here, where McManus and Young sold a large number of Novavax shares one day and five days after the March 18, 2021 Board meeting, respectively, there is temporal proximity between the acquisition of material, nonpublic information and stock sales. *See Goldstein v. Denner*, No. 2020-1061-JTL, 2022 WL 1797224, at *9 (Del. Ch. June 2, 2022) (finding that plaintiffs had sufficiently pleaded scienter on a *Brophy* claim in part because the defendant traded stock within 11 days of obtaining material, nonpublic information). Similarly, where Mott and Erck sold a large number of Novavax shares one week and two weeks after the September 16, 2021 Board meeting, respectively, there is temporal proximity as to their sales. *See id.*

As for the relative size of the transactions, on March 19, 2021, McManus sold 4,000 of 48,951 shares, representing 8.17 percent of his total shares, at a sale price of $220.78, resulting in $883,110 in proceeds. On March 23, 2021, Young sold 10,000 shares of his 158,750 shares, representing 6.30 percent of his total shares, at a sales price of $228.22, resulting in $2,282,230.78 in proceeds. Notably, on May 11, 2021, after an investor call during which Novavax disclosed to investors and analysts that it was unlikely to seek EUA until July 2021 at the earliest, Novavax's share price dropped to $138.18 per share, constituting a decline of 21 percent.

On September 23, 2021, Mott sold 24,961 of 72,961 shares, representing 34.21 percent of his total shares, at a share price of $252.90, resulting in $6,312,616.20 in proceeds. Between October 1 and 4, 2021, Erck sold 91,829 of 549,194 shares, representing 16.72 percent of his total shares, at sale prices of $175.10 and $176.15, resulting in $16,124,258.50 in proceeds. Notably, on October 20, 2021, after the publication of the *Politico* article, the Novavax share price fell to $136.86 per share, constituting a decline of 14 percent.

As for the size of the transactions relative to ordinary compensation, McManus received $883,110 in proceeds from the 2021 stock sales in question, compared to $876,252 in total compensation in 2020, $134,296 in total compensation in 2019, $241,678 in total compensation in 2018, and $246,512 in total compensation in 2017.  Young received $2,282,230.78 in proceeds from the 2021 stock sales in question, compared to $4,387,708 in total compensation in 2020, $223,741 in total compensation in 2019, $471,715 in total compensation in 2018, and $533,780 in total compensation in 2017.  Mott received $6,312,616.20 in proceeds from the 2021 stock sales in question, compared to $727,332 in total compensation in 2020, the year he joined the Board.  Erck received $16,124,258.50 in proceeds from the 2021 stock sales in question, compared to $48,086,018 in total compensation in 2020, $2,438,562 in total compensation in 2019, $4,158,398 in total compensation in 2018, and $2,771,685 in total compensation in 2017.

While the volumes of the sales in question do not represent overwhelmingly large fractions of these Director Defendants' total shares, they represent a very significant portion of the Director Defendants' ordinary compensation.  When combined with the highly suspicious timing of the sales, including the fact that the share prices dropped significantly after the sales, the Court finds that allegations are sufficient to support a *Brophy* claim at this stage.  *See In re Am. Int'l Grp.*, 965 A.2d 763, 801 (Del. Ch. 2009) (declining to dismiss *Brophy* claims where the defendants' stock sales represented 7 percent and 15 percent of their total shares and were suspicious in light of evidence that the defendants possessed material, nonpublic information); *Pfeiffer v. Toll*, 989 A.2d 683, 688–89 (Del. Ch. 2010) (finding that defendants' stock sales, including sales representing 29 percent of a defendant's total shares, were suspicious in timing and amount where they occurred during the same period that a company made misleading representations about its growth); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d at 265, 278 (finding that plaintiffs alleged sufficient

facts to support a *Brophy* claim in part because the proceeds received from the defendant's stock sales were over four times larger than the defendant's annual salary and the sales occurred six weeks before the Chief Financial Officer and Comptroller resigned and the company announced an internal investigation into financial results).

Although Defendants argue that all of Erck's trades were normal and routine in that they were made pursuant to a Rule 10b5-1 trading plan, at this stage the Court does not have information relating to when Erck entered into the trading plan or the specific terms of the plan. Without such information, the Court cannot find that the alleged nondiscretionary trading plan refutes the claim that the sales were improperly motivated. *Cf. KBC Asset Mgmt. NV v. DVX Tech. Co.*, 19 F.4th 601, 611 (4th Cir. 2021) (holding in relation to a claim of a violation of Rule 10b-5 that even with information on the existence of a 10b5-1 trading plans, the lack of evidence on when the defendants entered their plans prevented the court from concluding that the plans mitigated the "suggestion of motive" for the "suspicious trading"). Thus, where the particularized facts alleged demonstrate that half of the directors received a material personal benefit from the alleged conduct, *United Food & Comm. Workers Union*, 262 A.3d at 1059, and that there is a substantial likelihood of liability in that there is "some merit" to the claims against them, *see Rales*, 634 A.2d at 934, the Court finds that demand was futile as to Plaintiffs' *Brophy* claim.

Finally, because Plaintiffs' unjust enrichment claim rises and falls on the *Brophy* claim, the Court finds that demand was also futile as to Plaintiffs' unjust enrichment claim. *Tornetta v. Musk*, 250 A.3d 793, 813 (Del. Ch. 2019) (finding that if there is no *Brophy* breach of fiduciary duty, there is no unjust enrichment claim based on the same facts); *In re Camping World Holdings, Inc. S'holder Deriv. Litig.*, No. 2019-0179-LWW, 2022 WL 288152, at *7 n.83 (Del. Ch. Jan. 31,

2022) (finding that the demand futility analysis on an unjust enrichment claim necessarily rested upon whether the directors faced a substantial likelihood of liability on the *Brophy* claims).

## III.    Failure to State a Claim

Separate from the issue of demand futility, Defendants seek dismissal of all claims under Rule 12(b)(6) for failure to state a claim. Having concluded that the claims in Counts 1 and 2 are subject to dismissal based on the lack of a pre-suit demand, the Court need not address whether they are subject to dismissal under Rule 12(b)(6).

As to the claims in Counts 3 and 4 against Director Defendants McManus, Young, Mott, and Erck, in light of the Court's conclusion that demand was futile because there was a substantial likelihood of liability, it will not dismiss those claims pursuant to Rule 12(b)(6).

The Court, however, must address the claims in Counts 3 and 4 against Evans and the Officer Defendants other than Erck. Where the Court has previously analyzed Trizzino's stock sales in *Sinnathurai* and concluded that the timing, proceeds, and volume as compared to the prior year were indicative of insider trading, the Court will rely on that analysis and deny the present Motion as to the similar *Brophy* claim against Trizzino here. *See Sinnathurai*, 2022 WL 17585715, at *23-24.

As for the *Brophy* claims against Evans, Glenn, and Herrmann, Plaintiffs allege that they relied on material nonpublic information related to the problems with the development of the Vaccine, received in their role as directors and officers, in making profitable sales of Novavax stock before that information became public and caused the stock price to fall. As for whether Evans, Glenn, and Herrmann acquired material nonpublic information related to the problems with the development of the Vaccine, the minutes of the March 18, 2021 Board meeting reflect that they attended the meeting, which is the same meeting at which the Operations Update containing

adverse, material nonpublic information, was presented. *See supra* part II.B.1.  Thus, for the same reasons that the allegations support the claim that the other Director Defendants were aware of material nonpublic information prior to their trades, the Court finds sufficient allegations on this point as to these Defendants.

As for whether Evans, Glenn, and Herrmann relied on this material, nonpublic information in making stock sales, the Court considers temporal proximity between the acquisition of material, nonpublic information and the stock sales, whether the sales were normal and routine, and the relative size of the transactions as compared to the individual's holdings and regular compensation. *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d at 277; *In re Clovis Oncology, Inc. Deriv. Litig.*, 2019 WL 4850188, at \*15; *In re Primedia, Inc. S'holders Litig.*, 2013 WL 6797114, at \*14. On April 15, 2021 and April 19, 2021, Glenn sold a total of 8,129 of his 204,206 shares, representing 3.98 percent of his holdings, at sale prices of $200.35 and $219.72, respectively, earning $1,675,439.16 in proceeds.  On April 30, 2021, Herrmann sold 2,895 of 128,329 shares, representing 2.25 percent of his total shares, at a share price of $239.83, earning $694,317.13 in proceeds.  On May 10, 2021, Novavax announced that it was unlikely to seek an EUA from the FDA until July 2021, after which the Novavax stock price fell by 21 percent over two days to close at $138.18 on May 11, 2021.

As for the size of the transactions relative to ordinary compensation, Glenn received $1,675,439.16 in proceeds from the 2021 stock sales in question, as compared to $24,923,376 in total compensation in 2020, $1,875,198 in total compensation in 2019, and $1,681,456 in total compensation in 2018.  Herrmann received $694,317.13 from the 2020 stock sales in question, as compared to $20,606,814 in total compensation in 2020, $1,353,416 in total compensation in 2019, and $1,137,576 total compensation in 2018.

Although the volume of the sales in question do not represent overwhelmingly large fractions of these Officer Defendants' total shares, they do represent a significant portion of the Officer Directors' ordinary compensation, such that the proceeds are between 50 and 100 percent of Glenn and Herrmann's respective ordinary compensation for 2018 and 2019. In conjunction with the suspicious timing of the sales, between four and six weeks after the March 18, 2021 Board meeting, and the fact that the share prices dropped significantly after the sales, the Court finds that Plaintiffs have pleaded sufficient facts to support a *Brophy* claim at this stage. *See In re Primedia, Inc. S'holders Litig.*, 2013 WL 6797114, at *14 (finding that allegations that directors sold shares between four and five weeks before the announcement of the sale of the company were sufficient to raise a *Brophy* claim); *In re Am. Int'l Grp.*, 965 A.2d at 801; *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d at 265, 278. Accordingly, the Court will deny the Motion to Dismiss as to the *Brophy* claims against Glenn and Herrmann.

Evans, however, did not engage in any stock sales after the March 18, 2021 Board meeting until June 1, 2021, which was after the disclosure on May 10, 2021 of a delay in seeking EUA. His sale on June 1, 2021 was at a price in line with the share price following that announcement. Evans's only other stock sale in the relevant time period was on March 15, 2021, and Plaintiffs do not provide specific allegations demonstrating that Evans had material nonpublic information at that time. The Court therefore finds that Plaintiffs have not plausibly alleged a *Brophy* claim against Evans and will grant the Motion to Dismiss as to this claim.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss will be GRANTED IN PART and DENIED IN PART. The Motion will be granted as to (1) the claims in Count 1 for a violation of Section 14(a) of the Exchange Act and Rule 14a-9; (2) the claims in Count 2 for breach of fiduciary duty under *Caremark*; and (3) the claims in Counts 3 and 4 for breach of fiduciary duty and unjust enrichment as to Evans. The Motion will be otherwise denied. A separate Order shall issue.

Date:  August 21, 2023

THEODORE D. CHUANG
United States District Judge