**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | |
|---|---|
| IN RE NOVAVAX INC. STOCKHOLDER DERIVATIVE LITIGATION | Master File No.: 8:21-cv-02996-TDC |
| This Document Relates To: ALL ACTIONS | (Consolidated with No. 8:22-cv-01415-TDC and No. 1:22-cv-01417-TDC) |

# MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR APPROVAL OF ATTORNEYS' FEES AND EXPENSES AND PLAINTIFFS' SERVICE AWARDS

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........ iii

I. INTRODUCTION ........ 1

II. SUMMARY OF ALLEGATIONS, PROCEDURAL HISTORY, AND SETTLEMENT NEGOTIATIONS ........ 3

A. Relevant Procedural History ........ 5

1. Inspection Demands, Commencement, and Case Organization ........ 5

2. The Operative Complaint ........ 6

3. Briefing on the Defendants' Motion to Dismiss ........ 7

4. Early Mediation Efforts are Unsuccessful ........ 7

5. The Court Denies (in Part) the Motion to Dismiss ........ 8

6. Novavax Forms the SLC ........ 8

7. The SLC Investigation ........ 9

B. Plaintiffs' Renewed Settlement Demand; Settlement Negotiations and Mediations with the SLC and Defendants ........ 10

C. Preliminary Approval and Dissemination of Notice ........ 11

III. THE SETTLEMENT TERMS AND AGREED FEE AND EXPENSE AWARD ........ 11

IV. THE FEE AND EXPENSE AWARD MERITS APPROVAL ........ 12

A. The Settlement Warrants an Award of Attorneys' Fees and Expenses ........ 12

B. The Fee and Expense Award Was Agreed to at Arm's-Length ........ 13

C. The Relevant Factors Support Approval of the Fee and Expense Award ........ 15

1. Plaintiffs' Counsel's Efforts Have Resulted in Substantial Benefits to the Company that Support Approval of the Fee and Expense Award ....16

2. Plaintiff's Counsel's Skill and Efficiency and the Complexity and Duration of the Litigation ....22

3. Contingency Risk and Public Policy Considerations ....24

4. Time and Expenses Devoted to the Case and Lodestar Cross-Check ....25

V. THE SERVICE AWARDS TO PLAINTIFFS SHOULD BE APPROVED ....29

VI. CONCLUSION ....30

## TABLE OF AUTHORITIES

Cases Page(s)

*Altria Grp., Inc. Derivative Litig.*,
2023 WL 2116803 (E.D. Va. Feb. 17, 2023) ....29

*Barber v. Kimbrell's, Inc.*,
577 F.2d 216 (4th Cir. 1978) ....16

*Blum v. Stenson*,
465 U.S. 886 (1984) ....16

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980) ....13

*CASA de Maryland, Inc. v. Arbor Realty Trust, Inc.*,
2024 WL 1051120 (D. Md. Mar. 11, 2024) ....17

*Cohn v. Nelson*,
375 F. Supp. 2d 844 (E.D. Mo. 2005) ....13, 14, 24

*Collins v. United Pac. Ins. Co.*,
315 Md. 141, 553 A.2d 707 (1989) ....17

*Decohen v. Abbasi, LLC*,
299 F.R.D. 469 (D. Md. 2014) ....16, 17, 27

*Feinberg v. T. Rowe Price Grp., Inc.*,
610 F. Supp. 3d 758 (D. Md. 2022) ....25, 29

*Fire & Police Retiree Health Care Fund, San Antonio v. Smith*,
2020 WL 6826549 (D. Md. Nov. 20, 2020) ....26

*Goldberger v. Integrated Resources*,
209 F.3d 43 (2d Cir. 2000) ....16

*Goldenberg v. Marriott PLP Corp.*,
33 F. Supp. 2d 434 (D. Md. 1998) ....27

*Hensley v. Eckerhart*,
461 U.S. 424 (1983) ....13

*Hess Const. Co. v. Board of Educ. of Prince George's Cty.*,
341 Md. 155, 669 A.2d 1352 (1996) ....13

*In re 2U Inc. Sec. Litig.*,

No. 8:19-cv-03455-TDC (D. Md. Dec. 9, 2022) ....................17

*In re Activision, Inc. Shareholder Derivative Litigation,*
Case No. CV-06-4771 MRP (C.D. Cal. July 21, 2008) ....................22

*In re Alphatec Holdings, Inc., Derivative S'holder Litig.*,
No. 37-2010-58586-CU-BT-NC
(Ca. Super. Ct.-San Diego Cnty. Aug. 18, 2014) ....................21

*In re Apple Computer, Inc., Derivative Litig.*,
2008 WL 4820784 (N.D. Cal. Nov. 5, 2008) ....................22

*In re Atmel Corp. Derivative Litig.*,
No. 5:06-cv-04592-JF (HRL), slip op. (N.D. Cal. Mar. 31, 2010) ....................22

*In re Avon Products, Inc.*,
No. 651304/2010 (N.Y. Sup. Aug. 1, 2016) ....................21

*In re 3D Sys. Corp. Derivative Litig.*,
No. 0:15-cv-03756-MGL (D.S.C. Sept. 18, 2015) ....................22

*In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*,
909 F. Supp. 2d 259 (S.D.N.Y. 2012) ....................14

*In re Capital One Derivative S'holder Litig.*,
952 F. Supp. 2d 770 (E.D. Va. 2013) ....................24

*In re Celebrex Antitrust Litig.*,
2018 WL 2382091 (E.D. Va. Apr. 18, 2018) ....................15

*In re Cendant Corp. Derivative Action Litig.*,
232 F. Supp. 2d 327 (D.N.J. 2002) ....................30

*In re comScore, Inc. Shareholder Derivative Litigation*,
C.A. No. 1:16-cv-09855-JGK (S.D.N.Y. June 7, 2018) ....................15, 22

*In re Cont'l Ill. Sec. Litig.*,
962 F.2d 566 (7th Cir. 1992) ....................14

*In re CoreCivic, Inc. S'holder Deriv. Litig.*,
No. 3:16-cv-03040 (M.D. Tenn. Dec. 2, 2022) ....................21

*In re FAB Universal Corp. S'holder Derivative Litig.*,
148 F. Supp. 3d 277 (S.D.N.Y. 2015) ....................24, 25

*In re F5 Networks, Inc. Derivative Litig.*,

No. C06-794 RSL (W.D. Wash. Jan. 6, 2011) ....................21

*In re Genworth Sec. Litig.*,
210 F. Supp. 3d 837 (E.D. Va. 2016) ....................15, 16, 27

*In re Linerboard Antitrust Litig.*,
2004 WL 1221350 (E.D. Pa. June 2, 2004) ....................24

*In re Marsh ERISA Litig.*,
265 F.R.D. 128 (S.D.N.Y. 2010) ....................30

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
246 F.R.D. 156 (S.D.N.Y. 2007) ....................18

*In re Microstrategy, Inc.*,
172 F. Supp. 2d 778 (E.D. Va. 2001). ....................25, 26, 27, 29

*In re MiMedx Group. Inc. S'holder Derivative Litig.*, Lead Case,
No. 1:18-cv-04486-WMR (N.D. Ga. Dec. 21, 2020) ....................21

*In re Neustar*, *Inc. Sec. Litig.*,
2015 WL 8484438 (E.D. Va. Dec. 8, 2015) ....................30

*In re Pac. Enters. Sec. Litig.*,
47 F.3d 373 (9th Cir. 1995) ....................23

*In re Presidential Life*,
857 F. Supp. 331 (S.D.N.Y. 1994) ....................30

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
461 F. Supp. 2d 383 (D. Md. 2006) ....................27

*In re S. Co. S'holder Derivative Litig.*,
2022 WL 4545614 (N.D. Ga. June 9, 2022) ....................13, 29

*In re The Mills Corp. Sec. Litig.*,
265 F.R.D. 246 (E.D. Va. 2009) ....................16, 24

*In re Warner Commc'ns Sec. Litig.*,
618 F. Supp. 735 (S.D.N.Y. 1985) ....................25

*In re Zuora, Inc. Deriv. Litig.*,
No. 3:19-cv-05701-SI (N.D. Cal. Sept. 18, 2023) ....................22

*Ingram v. Coca-Cola Co.*,
200 F.R.D. 685 (N.D. Ga. 2001) ....................14

*Jernigan, v. Protas, Spivok & Collins, LLC*,
2017 WL 4176217 (D. Md. Sept. 20, 2017) ..... 17

*Johnson v. Ga. Highway Express, Inc.*,
488 F.2d 714 (5th Cir. 1974) ..... 16

*Jones v. Dominion Resources Servs., Inc.*,
601 F. Supp. 2d 756 (S.D.W. Va. Mar. 6, 2009) ..... 25, 26, 27

*Kamen v. Kemper Fin. Servs. Inc.*,
500 U.S. 90 (1991) ..... 23

*Kay Co. v. Equitable Prod. Co.*,
749 F. Supp. 2d 455 (S.D.W. Va. 2010) ..... 27

*Kelly v. Johns Hopkins Univ.*,
2020 WL 434473 (D. Md. Jan. 28, 2020) ..... 16, 17, 27

*Kreischer v. Kerrison Dry Goods Co.*,
2000 WL 1157805 (4th Cir. 2000) ..... 12

*Kruger v. Novant Health, Inc.*,
2016 WL 6769066 (M.D.N.C. Sept. 29, 2016) ..... 27

*Lizondro—Garcia v. Kefi LLC*,
2014 WL 4996248 (S.D.N.Y. Oct.7, 2014) ..... 30

*Mathes v. Roberts*,
85 F.R.D. 710 (S.D.N.Y. 1980) ..... 25

*McAdams v. Robinson*,
26 F.4th 149 (4th Cir. Feb. 10, 2022) ..... 17

*McDaniels v. Westlake Servs.*, LLC,
2014 WL 556288 (D. Md. Feb. 7, 2014) ..... 17

*Meyer v. Erck*,
Case No. 8:21-cv-02996 (Nov. 22, 2021) ..... 6

*Mills v. The Elec. Auto-Lite Co.*,
396 U.S. 375 (1970) ..... 12

*Muhammad v. Nat'l City Mortgage, Inc.*,
2008 WL 5377783 (S.D.W. Va. Dec. 19, 2008) ..... 25

*Nixon-Crenshaw v. Coley*,

No. 1:18-cv-25289-AHS, slip op. (S.D. Fla. Oct. 1, 2021) ....................22

*Orman v. Am. Online, Inc.*,
1998 WL 1969646 (E.D. Va. Dec. 14, 1998) ....................18

*Payne v. Sprint Commc'ns Co. L.P.*,
2012 WL 13006270 (D. Md. Nov. 30, 2012) ....................17

*Sauby v. City of Fargo*,
2009 WL 2168942 (D.N.D. July 16, 2009) ....................30

*Schuler v. Meds. Co.*,
2016 WL 3457218 (D.N.J. June 24, 2016) ....................18

*Seaman v. Duke Univ. Health Sys.*,
2019 WL 4674758 (M.D.N.C. Sept. 25, 2019) ....................26, 29

*Shapiro v JP Morgan Chase & Co.*,
2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) ....................14

*Silverberg v. Gol*d,
2013 WL 6859282 (Del. Ch. Dec. 31, 2013) ....................23

*Singleton v. Domino's Pizza, LLC*,
976 F.Supp.2d 665 (D. Md. 2013) ....................17, 27

*Sinnathurai v. Novavax, Inc., et al.*,
Case No. 8:21-cv-02910 (D. Md.) ....................6

*Smith v. Krispy Kreme Doughnut Corp.*,
2007 WL 119157 (M.D.N.C. Jan. 10, 2007) ....................24

*The Officers for Just. v. The Civil Serv. Comm'n of San Francisco*,
688 F.2d 615 (9th Cir. 1982) ....................14

*Thomas v. FTS USA, LLC*,
2017 WL 1148283 (E.D. Va. Jan. 1, 2017) ....................26

*Witt v. CoreLogic SafeRent, LLC*,
2018 WL 1560069 (E.D. Va. Mar. 22, 2018) ....................27

*Yung v. Erck*,
Case No. 8:21-cv-03248 (Dec. 12, 2021) ....................6

*Zapata Corp. v. Maldonado*,
430 A.2d 779 (Del. 1981) ....................24

Statutes

8 Del. C. § 220 ........................................................................................................2, 5, 6, 28

15 U.S.C. § 78n(a)(1)...........................................................................................................6

Fed. R. Civ. P. 12(b)(6).........................................................................................................7

Fed. R. Civ. P 23.1 ...............................................................................................................7

Other

Ira M. Millstein & Paul W. MacAvoy,
*The Active Board of Directors and Performance of the Large Publicly Traded Corporation*,
98 Colum. L. Rev. 1283, 1318 (1998) ..............................................................................20

Lawrence D. Brown & Marcus L. Caylor, *The Correlation Between Corporate Governance and Company Performance*,
Institutional Shareholder Services (2004)..........................................................................20

Lucian A. Bebchuk & Assaf Hamdani,
*The Elusive Quest for Global Governance Standards*,
157 U. Pa. L. Rev. 1263, 1266 (2009) ..............................................................................21

Paul A. Gompers, Joy L. Ishii & Andrew Metrick,
*Corporate Governance and Equity Prices*,
118 Quarterly J. Econ. (2003)...........................................................................................21

Lawrence D. Brown & Marcus L. Caylor,
*The Correlation Between Corporate Governance and Company Performance*,
Institutional Shareholder Services (2004)..........................................................................21

Vincent Cunat, Mireia Gine, & Maria Guadalupe,
*The Vote is Cast: The Effect of Corporate Governance on Shareholder Value*,
67 J. Finance, Oct. 2012 ....................................................................................................21

Plaintiffs Amy Snyder, Michele Rosati, and Charles Blackburn respectfully submit this Memorandum of Law in Support of Plaintiffs' Motion for Approval of Attorneys' Fees and Expenses and Service Awards for Plaintiffs (the "Fee Motion").[1] This Fee Motion is supported by the Declarations of Gregory N. Nespole ("Nespole Decl.") and exhibits thereto.

## I. INTRODUCTION

This derivative action brought on behalf of Novavax Inc. ("Novavax" or the "Company") arises from its officers and directors of fiduciary duty and unjust enrichment through stock sales allegedly based on material non-public information ("MNPI"). Plaintiffs allege that in 2021, defendants inflated the Company's stock price by materially misleading the public about the prospects and timing for FDA approval of the Company's COVID-19 vaccine candidate, and certain of the Company's officers and directors sold Novavax stock at artificially inflated prices and reaped millions of dollars in ill-gotten gains.

Following Plaintiffs' successful litigation efforts (including extensive pre-suit investigations that resulted in a complaint that substantially defeated defendants' motion to dismiss), an investigation by the Special Litigation Committee ("SLC") formed by Novavax in response to the denial of the motion to dismiss, and extensive settlement negotiations and multiple mediation sessions overseen by former Chancellor of the Delaware Court of Chancery Andre G. Bouchard (the "Mediator"), the parties reached an agreement to resolve the Action, subject to Court approval. The Settlement consideration consists of a cash payment of $6,750,000 from defendants Stanley C. Erck and John A. Herrmann III and/or their insurers to Novavax (the "Settlement Amount") and the Company's implementation of a set of corporate governance reforms (set forth in Exhibit A to the Stipulation of Settlement), tailored to prevent a

[1] Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Stipulation and Agreement of Settlement dated November 22, 2024.

recurrence of the alleged wrongdoing.

The Settlement was achieved through the diligent work of Plaintiffs' Counsel, including: (i) their pre-suit investigation, which included inspection demands made pursuant to 8 Del. C. § 220 and a separate Freedom of Information Action ("FOIA") request; (ii) filing a thorough consolidated amended complaint using information obtained through the foregoing efforts; (iii) defeating defendants' motion to dismiss Plaintiffs' claims for breach of fiduciary duty for insider selling and unjust enrichment; (iv) following the Company's formation of the SLC, supporting its investigation, including as to the facts at issue and applicable law; and (v) Plaintiffs' Counsel's critical role in securing the settlement consideration, including through the negotiations resulting in the $6,750,000 cash payment to Novavax and the Governance Reforms.

The Company, SLC, and Individual Defendants acknowledge and agree that: (i) the Action and the efforts of Plaintiffs' Counsel were substantial factors in securing the Settlement Amount and the Governance Reforms; (ii) the agreement on the Settlement Amount and the Governance Reforms was a direct result of the Action; and (iii) the Settlement Amount and the Governance Reforms confer substantial benefits on the Company and its stockholders. Stip., ¶¶2.1, 4.1.

In recognition of Plaintiffs' Counsel's efforts and role in securing the substantial benefits conferred on Novavax, Defendants have agreed to pay Plaintiffs' Counsel attorneys' fees and expenses in the amount of $2,000,000, subject to Court approval. The fee agreement was reached in a separate negotiation after the Stipulation of Settlement was executed. The Settlement is not contingent upon an award of attorneys' fees, eliminating any possibility of collusion. All parties, including the SLC and Defendants, who had every incentive to negotiate the lowest reasonable fee, were represented by experienced counsel. The negotiations focused on the factors relevant under applicable case law, including estimates of the range of value of the

Settlement benefit and fees awarded in comparable cases. Accordingly, the parties' judgment that the agreed Fee and Expense Award is fair, and merits substantial deference.

The Settlement Amount is an outstanding recovery for Novavax, particularly given the risks and expense associated with trying to improve upon the recovery through further litigation, including the possibility that the Company ultimately would recover nothing. The value of the Governance Reforms in preventing future losses and restoring the Company's credibility among investors, further justifies the Fee and Expense Award. The agreed Fee and Expense Award also is reasonable considering Plaintiffs' Counsel's lodestar, which was incurred through well-organized and efficient efforts necessary to litigate the case and to achieve the Settlement. The Fee and Expense Award would yield no lodestar multiple, which is below the range considered reasonable in this Circuit.

The Court approved the proposed form and method of notice as consistent with legal and due process standards. *See* Preliminary Approval Order, ECF Nos. 128, 129 ("Preliminary Approval Order"). Novavax timely disseminated the Court-approved Notice. To date, no objections to the agreed Fee and Expense Award (or the Settlement itself) have been received from Current Novavax Stockholders. Nespole Decl., ¶6.

Plaintiffs respectfully submit that the separately negotiated Fee and Expense Award is fair and reasonable and (along with the underlying Settlement and Service Awards) should be approved in full.

## II. SUMMARY OF ALLEGATIONS, PROCEDURAL HISTORY, AND SETTLEMENT NEGOTIATIONS

Novavax is biotechnology company that develops and commercializes vaccines to prevent infectious diseases. ¶¶2, 58-68.[2] The Company was one of the earliest participants in

[2] Citations to "¶ _" refer to Plaintiffs' Verified Third Amended Consolidated Stockholder

Operation Warp Speed ("OWS"), the U.S. government's $10 billion effort to develop and deliver a COVID-19 vaccine. *Id.* The Company received over $1.6 billion in taxpayer dollars, after which it struggled to develop, manufacture and then test a vaccine candidate. *Id.*

At the same time, the Company's executives received outsized compensation and sold Company stock at inflated prices based on their knowledge of adverse material non-public information ("MNPI") about the state of the Company's efforts, including its persistent failure to comply with current Good Manufacturing Practices ("cGMPs"). *Id*.

The Company's COVID-19 vaccine candidate was NVX-CoV2373. ¶¶3, 69-73. Novavax publicly stated in early 2021 that it planned to complete Emergency Use Authorization ("EUA") submissions for NVX-CoV2373 with the U.S. Food and Drug Administration ("FDA") in the second quarter of that year. *Id.* Plaintiffs allege that the drug's prospects and timeline, however, were woefully disconnected from management's rosy predictions, all of which Plaintiffs allege proved to be false and misleading. *Id*.

Plaintiffs allege that the Board inflated the Company's stock price by materially misleading the public about when the Company actually planned to complete the EUA submission and the true reasons why the EUA submission was delayed. ¶¶4, 69-167. While falsely touting the prospects for NVX-CoV2373's approval and assuring the public that it would be done on an expedited basis, certain of the Company's executive officers and directors sold Novavax stock at artificially inflated prices and reaped millions of dollars in ill-gotten gains. *Id.* Plaintiffs also allege that members of the Board misled investors about the vaccine's purported successful development, production, and imminent FDA approval. *Id*.

Plaintiffs allege that the truth about Novavax's troubled and delayed vaccine candidate was

---

Derivative Complaint (the "Third Amended Complaint") filed on November 30, 2022. ECF No. 52.

revealed on October 19, 2021, when *Politico* published an article containing interviews with several Novavax employees detailing the extent of the Company's manufacturing problems, including the Company's inability to manufacture a vaccine that met the FDA's purity and potency requirements. ¶¶7, 168-189. The article reported that Novavax's vaccine would likely not be approved until late 2022 – almost a full year later. *Id.* Novavax's stock subsequently fell over 50% in response to this, and other disclosures related to Novavax's manufacturing issues and inability to meet FDA requirements. *Id.*

Plaintiffs allege that before the truth was publicly known, defendant Stanley Erck alone sold over 150,000 shares of Novavax stock reaping proceeds of over $38 million and that Novavax's officers and directors made a total of over $86 million in ill-gotten gains by shedding thousands of shares right before the Company admitted to regulatory delays. ¶¶8, 207-220.

### A. Relevant Procedural History

#### 1. Inspection Demands, Commencement, and Case Organization

On December 30, 2021, January 28, 2022, and March 4, 2022, respectively, plaintiffs Rosati, Blackburn, and Snyder sent inspection demands to Novavax, seeking the production of relevant corporate books and records pursuant to 8 Del. C. § 220. Nespole Decl., ¶14. Plaintiffs Rosati, Blackburn, and Snyder thereafter negotiated the scope and timing of and ultimately secured the production of relevant corporate books and records of Novavax. *Id*.

In addition, on or about May 20, 2022, plaintiff Blackburn submitted a FOIA request to the U.S. Food and Drug Administration ("FDA") requesting "correspondence, inspection reports, complaints, and/or regulatory action taken by the FDA as to Novavax or FUJIFILM Disoynth Biotechnologies regarding manufacturing deficiencies at its College Station, Texas and/or Morrisville, North Carolina facilities." On May 26, 2022, the FDA produced to plaintiff Blackburn inspection reports and Form 483s related to inspections between March 2021 and

August 2021. Plaintiff Blackburn, through his counsel, reviewed and analyzed the documents, and relevant information was alleged in the complaint. *Id.*

Plaintiffs Rosati and Blackburn incorporated information from the nearly 2,800 pages of corporate books and records they had obtained in a derivative complaint filed with the Court on June 10, 2022, which pleaded claims for breach of fiduciary duty, unjust enrichment, and federal securities violations. Nespole Decl. ¶29. Plaintiff Snyder likewise incorporated information from the approximately 2,800 pages of corporate books and records she had obtained in a derivative complaint filed with the Court on June 10, 2022, which pleaded claims for breach of fiduciary duty and unjust enrichment.[3] *Id.*

On October 6, 2022, the Court signed the parties' stipulated order (i) consolidating the four related derivative actions; (ii) appointing Levi & Korsinsky LLP, Robbins LLP, and Glancy Prongay & Murray LLP, as co-lead counsel for Plaintiffs; and (iii) appointing Adelberg, Rudow, Dorf & Hendler LLC as liaison counsel for Plaintiffs. ECF No. 42.[4]

**2. The Operative Complaint**

On November 21, 2022, Plaintiffs filed the Third Amended Consolidated Complaint, which incorporated the FOIA materials and books and records obtained by Plaintiffs from the Company pursuant to 8 Del. C. § 220, as discussed above. ECF No. 52. The Complaint pleaded claims for: (1) violations of Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), for knowingly making false statements and material omissions in the Company's November 2021

---

[3] Two related stockholder derivative actions also were filed in this Court: *Meyer v. Erck*, Case No. 8:21-cv-02996 (filed on November 22, 2021), and *Yung v. Erck*, Case No. 8:21-cv-03248 (filed on December 12, 2021).

[4] A related securities class action, captioned *Sinnathurai v. Novavax, Inc., et al.*, Case No. 8:21-cv-02910 (D. Md.), also was filed in this Court. That case ultimately settled for $47 million, all of which was paid by D&O insurance, not by Novavax itself. This Court approved the settlement of the securities class action on May 24, 2024.

Proxy Statement ("Count I"); (2) breach of fiduciary duty by the Company's Board of Directors (the "Board") for inadequate oversight of the Company's COVID-19 vaccine development process ("Count II"); (3) breach of fiduciary duty arising from stock sales by certain defendants made based on material nonpublic information related to alleged challenges and setbacks the Company faced with respect to its application for Emergency Use Authorization of its COVID-19 vaccine candidate in the United States ("Count III"); and (4) unjust enrichment arising from the challenged stock sales ("Count IV"). Among other things, Plaintiffs sought damages and equitable relief, including the adoption of corporate governance reforms. The Complaint alleged that demand on Novavax's Board was futile because (among other reasons) at least half of the Board members faced a substantial likelihood of liability.

**3. Briefing on the Defendants' Motion to Dismiss**

On February 10, 2023, defendants moved to dismiss the Complaint (the "Motion to Dismiss") for failure to plead demand futility under Rule 23.1 of the Federal Rules of Civil Procedure and for failure to state a claim under Rule 12(b)(6), of the Federal Rules of Civil Procedure. ECF Nos. 60, 61. On April 11, 2023, Plaintiffs filed an opposition to the Motion to Dismiss, arguing (among other things) that: (i) Plaintiffs had adequately alleged that demand was futile under Rule 23.1 because at least half of the members of Novavax's Board faced a substantial likelihood of liability; and (ii) Plaintiffs had sufficiently pleaded all of their claims under Rule 12(b)(6). ECF No. 66. Defendants filed a reply brief in support of the Motion to Dismiss on May 11, 2023. ECF No. 70.

**4. Early Mediation Efforts are Unsuccessful**

Following the close of briefing on the Motion to Dismiss (but before any decision by the Court), on June 27, 2023, Plaintiffs' Counsel and counsel for the Individual Defendants and Novavax participated in an in-person mediation in New York before Gregory P. Lindstrom of

Phillips ADR Enterprises. Nespole Decl., ¶18. In advance of the mediation, Plaintiffs prepared and sent a comprehensive settlement demand that set forth Plaintiffs' damages and disgorgement analyses and included both a monetary demand (Plaintiffs insisted throughout the process that any settlement must include a cash payment) and proposed corporate governance reforms. Plaintiffs also received and evaluated additional documents and information provided in connection with the mediation, including the applicable D&O insurance policies. *Id.* Despite the parties' efforts, the mediation was not successful. *Id.*

**5. The Court Denies (in Part) the Motion to Dismiss**

By a Memorandum Opinion and Order dated August 21, 2023, the Court denied, in part, the Motion to Dismiss. ECF Nos. 80, 81. While the Court dismissed Counts I and II all claims against Gary C. Evans, it denied the Motion to Dismiss as to Counts III and IV against the other defendants. The Court held that (i) Plaintiffs had adequately alleged that the selling defendants possessed material non-public information ("MNPI") when they sold stock; (ii) the alleged timing, size, and nature of the sales supported at least a pleading-stage inference that the trades were improper (i.e., motivated, at least in part, by the MNPI); and (iii) as a result, Plaintiffs had adequately alleged demand futility and sufficiently stated their claims for breach of fiduciary duty for insider selling and for unjust enrichment. ECF No. 80 at 28-35.

**6. Novavax Forms the SLC**

In response to the Court's denial of the motion to dismiss Plaintiffs' insider selling and unjust enrichment claims, on October 6, 2023, the Board established the SLC, which consisted of outside, non-defendant directors Rachel King and Margaret McGlynn. The SLC was authorized, among other things, to investigate the stock sale claims – as well as Plaintiffs' other claims and allegations – to determine an appropriate course of action with respect thereto, with all such determinations deemed final and binding upon the Company and not subject to review or

approval by the full Board. The SLC engaged its own independent counsel, Wilson Sonsini Goodrich & Rosati, P.C., to assist with its investigation. Stip., at 5, ¶F. On November 6, 2023, following extended negotiations over terms, the parties stipulated to stay the Action pending the SLC's investigation, which the Court granted. ECF Nos. 94, 95. The Action was stayed for six months, which was later extended. ECF No. 98.

**7. The SLC Investigation**

Between October 2023 and May 2024, the SLC investigated the claims raised in the Action. Stip., at 6, ¶H. Plaintiffs' Counsel met with the SLC on multiple occasions during the course of the SLC's investigation to (among other things) monitor the status and progress of the SLC's investigation and to provide information and input to the SLC. Nespole Decl., ¶23.

By way of example, on March 8, 2024, Plaintiffs' Counsel sent SLC Counsel a lengthy and detailed letter addressing and supporting Plaintiffs' contention that Defendants Erck, Glenn, Herrmann, Mott, and Trizzino violated the Company's Insider Trading Policy by entering into 10b5-1 sales plans while in possession of MNPI concerning the Company's business, and then sold more than $65 million in Company stock at inflated prices while in possession of such information. Nespole Decl., ¶24.

On March 11, 2024, Plaintiffs and their counsel met with the SLC and SLC Counsel in person (and telephonically) to make a formal presentation to the SLC, to discuss Plaintiffs' letter, and to urge the SLC to prosecute claims against the individual defendants on behalf of the Company (or, alternatively, to allow Plaintiffs' counsel to continue prosecuting the claims alleged in the Action). Nespole Decl., ¶25.

In furtherance of these efforts, on March 12, 2024, Plaintiffs' Counsel sent SLC Counsel an email addressing the relationship between breach of fiduciary duty claims predicated on insider trading and breaches of the duty of disclosure, together with legal authority supporting

Plaintiffs' position that the defendants breached their fiduciary duty in connection with their stock sales here irrespective of whether they were legally obligated to publicly disclose each piece of MNPI. Nespole Decl., ¶26. Plaintiffs also reviewed and evaluated certain documents produced by the SLC in connection with its investigation and the parties' settlement negotiations, including all applicable 10b5-1 plans relevant to the Action. *Id*.

**B. Plaintiffs' Renewed Settlement Demand; Settlement Negotiations and Mediations with the SLC and Defendants**

Plaintiffs prepared and sent the SLC and Defendants a renewed settlement demand on November 20, 2023, detailing Plaintiffs' damages and disgorgement analyses and including a monetary demand and a set of proposed corporate governance reforms designed to prevent a recurrence of the alleged wrongdoing. Nespole Decl., ¶22.

Following the conclusion of its investigation, the SLC engaged in discussions with Defendants and Plaintiffs' Counsel regarding exploring a potential settlement. Stip., at 7, ¶L. On June 6, 2024, the parties filed a stipulation extending the stay until August 5, 2024, to allow the SLC to discuss its findings and proposed next steps with the parties, which was granted by the Court. ECF No. 101. The parties and the SLC agreed to engage Andre G. Bouchard ("Mediator"), former Chancellor of the Delaware Court of Chancery, to conduct a formal mediation. Stip., at 7, ¶M.

On July 19, 2024, the SLC made a formal presentation to Plaintiffs' Counsel, about its factual findings and proposed course of action, including the possibility of exploring a potential settlement. Nespole Decl., ¶29. Plaintiffs evaluated the SLC's presentation, prepared a series of follow-up questions and comments, and sent and then discussed those questions with the SLC. *Id*.

The Mediator presided over an initial mediation session on July 31, 2024. Thereafter, the

parties stipulated to further extend the stay of the Action until November 4, 2024, to continue their mediation efforts, which was granted by the Court. ECF No. 103. Plaintiffs' Counsel attended the mediation and was an active participant in the mediation session. Stip., at 7, ¶M; Nespole Decl., ¶30.

Following another mediation session held on September 16, 2024 and settlement discussions thereafter, the Settling Parties agreed to the Settlement, pursuant to which: (i) defendants Stanley C. Erck and John A. Herrmann III will pay, or cause to be paid on their behalf, the Settlement Amount; and (ii) the Company will implement the Governance Reforms. Plaintiffs' Counsel participated in the second mediation and was an active participant in the mediation session, including the settlement discussions that occurred thereafter. Stip., at 8, ¶N.

Throughout the settlement process, Plaintiffs' Counsel negotiated directly with the SLC Counsel and with counsel for the Defendants as to both the monetary component and the Governance Reforms, working from (among other things) Plaintiffs' allegations, disgorgement analysis, and governance proposals, as set forth in their settlement demand. Nespole Decl., ¶32.

Following execution of the Stipulation on November 22, 2024, Plaintiffs' Counsel and the SLC's counsel engaged in a separate negotiation over a reasonable amount of attorneys' fees and expenses for Plaintiffs' Counsel in recognition of their efforts in securing the substantial benefits conferred on Novavax through the Settlement. Nespole Decl., ¶33.

### C. Preliminary Approval and Dissemination of Notice

On December 12, 2024, the Court granted preliminary approval of the Settlement and approved the proposed notice program, ECF No. 129. To date, no objections have been received from Current Novavax Stockholders. Nespole Decl., ¶39.

## III. THE SETTLEMENT TERMS AND AGREED FEE AND EXPENSE AWARD

The Settlement provides that defendants Stanley C. Erck and John A. Herrmann III shall

pay or cause their insurers to pay $6,750,000 to Novavax. Stip., ¶2.1. In addition, the Settlement provides that Novavax will implement the Governance Reforms. The Company, the SLC, and the Individual Defendants acknowledge and agree that: (i) the Action and the efforts of Plaintiffs' Counsel were substantial factors in securing the Settlement Amount and the Governance Reforms; (ii) the agreement on the Settlement Amount and the Governance Reforms was a direct result of the Action; and (iii) the Settlement Amount and the Governance Reforms confer substantial benefits on the Company and its stockholders. Stip., ¶¶2.1, 4.1.

In recognition of Plaintiffs' Counsel's efforts and role in securing the substantial benefits conferred on Novavax through payment of the Settlement Amount to the Company and implementation of the Governance Reforms, Defendants have agreed to pay Plaintiffs' Counsel attorneys' fees and expenses in the amount of $2,000,000, subject to Court approval. Nespole Decl., ¶38.

## IV. THE FEE AND EXPENSE AWARD MERITS APPROVAL

### A. The Settlement Warrants an Award of Attorneys' Fees and Expenses

Under the substantial benefit doctrine, counsel who prosecute a derivative action that results in substantial benefits for the corporation are entitled to an award of fee and expenses in reasonable proportion to the value of the benefits and taking into account the risks of proceeding on contingency. *Mills v. The Elec. Auto-Lite Co*, 396 U.S. 375, 394-96 (1970)("[A] corporation may receive a 'substantial benefit … justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature.… [P]rivate stockholders' actions of this sort 'involve corporate therapeutics,' and furnish a benefit to all shareholders[.]"). *See generally Kreischer v. Kerrison Dry Goods Co.*, 2000 WL 1157805, at *4 (4th Cir. 2000) (noting applicability of *Mills* to derivative actions in justifying attorneys' fees paid for substantial benefit conferred on corporation, including non-pecuniary benefits). Indeed, even settlements that do not include a

monetary component but are "supported by reforms 'specifically designed to minimize the probability of violations of fiduciary duties and federal securities laws' are generally approved because they make it 'far less likely [that the corporation will] become subject to long and costly securities litigation [or to] ... prosecution or investigation by regulators and prosecutors.'" *In re S. Co. S'holder Derivative Litig.*, 2022 WL 4545614, at *8 (N.D. Ga. June 9, 2022).[5]

Here, as acknowledged by the SLC and the Company in the Stipulation, and in the SLC's settlement approval papers, the Settlement Amount and the Governance Reforms, separately and taken together, confer substantial benefits on Novavax and its stockholders, and Plaintiffs' Counsel are entitled to attorneys' fees and expenses (subject to Court approval) in recognition of their substantial role in securing those benefits. Stip., ¶¶2.1, 4.1.

**B. The Fee and Expense Award Was Agreed to at Arm's-Length**

The U.S. Supreme Court has endorsed the consensual resolution of the amount of attorneys' fees to be paid to plaintiffs' counsel in representative litigation. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("A request for attorney's fees should not result in a second major litigation. Ideally ... litigants will settle the amount of a fee."); *see also Cohn v. Nelson*, 375 F. Supp. 2d at 861 (E.D. Mo. 2005) ("[W]here, as here, the parties have agreed on the amount of

---

[5] Common fund cases that use the "percentage of recovery" method for calculating attorneys' fees are grounded in the "substantial benefit doctrine," under which counsel who prosecute a stockholder derivative case that confers benefits on a corporation are entitled to an award of attorneys' fees and costs. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). Although the common fund doctrine is most often applied in class action cases, the doctrine applies with equal force to settlements or judgments in shareholder derivative suits. *Kreischer v. Kerrison Dry Goods*, 2000 WL 1157805, at *4 (4th Cir. Aug. 16, 2000) (unpublished opinion) ("The common fund exception typically applies in a shareholder derivative action."). *See also Hess Const. Co. v. Board of Educ. of Prince George's Cty.*, 341 Md. 155, 169, 669 A.2d 1352, 1358 (1996) ("The common fund theory has been applied or recognized . . . where a stockholder's derivative action benefitted all of the shareholders . . . .").

attorneys' fees and expenses, courts give the parties' agreement substantial deference."). "[T]he court's intrusion upon what is otherwise a private consensual agreement ... must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Just. v. The Civil Serv. Comm'n of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). Accordingly, where the fee negotiations were conducted at arm's-length and there is no evidence of collusion, courts accord "substantial deference" to the parties' agreement. *Cohn*, 375 F. Supp. 2d at 861; *see Shapiro v JP Morgan Chase & Co.*, 2014 WL 1224666, at *25 (S.D.N.Y. Mar. 24, 2014) ("That the Attorneys' Fee Payment was later separately negotiated weighs in favor of its reasonableness."); *In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*, 909 F. Supp. 2d 259, 265 (S.D.N.Y. 2012) (parties' negotiated agreement on fee supports approval); *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 568-70 (7th Cir. 1992) (market factors best understood by negotiating parties should determine quantum of attorneys' fees); *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 695 (N.D. Ga. 2001) (affording "substantial weight to a negotiated fee amount").

Here, the Parties negotiated the Fee and Expense Award at arm's-length based upon their respective valuation of the benefit to Novavax from the Settlement Amount and the Governance Reforms and an assessment of the amount that would fairly and reasonably compensate Plaintiffs' counsel for the risks and efforts undertaken in commencing and prosecuting the Action on a contingency fee basis. These negotiations, which were conducted separately after agreement on the substantive terms of the Settlement and execution of the Stipulation, occurred directly between counsel for the SLC, Defendants' counsel, and Plaintiffs' Counsel. The agreed-to Fee and Expense Award reflects all counsel's experience, as to what is fair, reasonable, and adequate under the circumstances here. In these circumstances, the Court is not required to

fashion a fee and expense award. Rather, the Court need only determine whether the agreed Fee and Expense Award falls within the range of reasonableness.

Unlike in class actions where the diverging interests of class counsel and absent class members at the fee stage warrant close judicial scrutiny, in this stockholder derivative matter, Novavax and the SLC participated in the negotiations, were represented by counsel, and had every incentive to pay the lowest possible fee for the services rendered by Plaintiffs' Counsel, further ensuring a fair fee process. *See, e.g.*, *In re Google Inc. S'holder Derivative Litig.*, Case No. 4:11-cv-04248-PJH, Tr. of Fairness Hearing at 11:21-12:6 (N.D. Cal. Jan. 21, 2015) (in evaluating agreed fee amount in derivative action, "the Court's responsibility is a little different than in your typical class action given the determination by the corporate entity that the amount is satisfactory") (Nespole Decl., Ex. J); *In re comScore S'holder Derivative Litig.*, CA No. 1:16-cv-09855-JGK, Tr. of Final Approval Hearing at 20:15-21:12 (S.D.N.Y. June 7, 2018) (approving settlement and fee agreement endorsed by disinterested directors) (Nespole Decl., Ex. K).

### C. The Relevant Factors Support Approval of the Fee and Expense Award

The factors employed by courts in the Fourth Circuit include: (1) the results obtained; (2) the presence or absence of substantial objections;[6] (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) awards in similar cases. *In re Genworth Sec. Litig.*, 210 F. Supp. 3d 837, 843 (E.D. Va. 2016).[7] Other district courts have used

[6] "A lack of objections by class members as to fees requested by counsel weighs in favor of the reasonableness of the fees." *Genworth*, 210 F. Supp. 3d at 844. Here, to date, no stockholder has objected to the Fee and Expense Award (or any portion of the Settlement), which weighs in favor of approval. Nespole Decl., ¶39.

[7] Some district courts in this Circuit have replaced the sixth factor with public policy

the twelve factors identified in *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 & n.28 (4th Cir. 1978) (adopting factors from *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974)).[8] Here, the agreed Fee and Expense Award is reasonable under either test.

### 1. Plaintiffs' Counsel's Efforts Have Resulted in Substantial Benefits to the Company that Support Approval of the Fee and Expense Award

"The first and most important factor for a court to consider when making a fee award is the result achieved." *Genworth*, 210 F. Supp. 3d at 843. Here, the Settlement confers substantial benefits on Novavax in the form of the $6.75 million Settlement Amount and the Governance Reforms.

**<u>The Settlement Amount Confers a Substantial Benefit that Justifies the Fee and Expense Award</u>:**

The Supreme Court has opined that percentage-of-recovery is the proper method for awarding attorneys' fees under the common fund doctrine. *See Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984) ("[U]nder the 'common fund doctrine,' . . . a reasonable fee is based on a percentage of the fund …"). "While the Fourth Circuit has not definitively answered this debate, other districts within this Circuit, and the vast majority of courts in other jurisdictions consistently apply a percentage of the fund method for calculating attorneys' fees in common fund cases." *Mills*, 265 F.R.D. at 260; *see, e.g., Kelly v. Johns Hopkins Univ.*, 2020 WL 434473,

---

considerations. *See, e.g., Celebrex*, 2018 WL 2382091, at *4; *In re The Mills Corp. Sec. Litig.,* 265 F.R.D. 246 (E.D. Va. 2009) (citing, *inter alia*, *Goldberger v. Integrated Resurces*, 209 F.3d 43, 50 (2d Cir. 2000).

[8] The twelve factors are: "(1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorney's fees awards in similar cases." *Id.*

at *2 (D. Md. Jan. 28, 2020) ("Within the Fourth Circuit, district courts prefer the percentage method in common-fund cases."); *Decohen v. Abbasi, LLC*, 299 F.R.D. 469, 481 (D. Md. 2014) ("District Courts in the Fourth Circuit, and the majority of courts in other jurisdictions, use the percentage of recovery method in common fund cases.").

Courts in the Fourth Circuit have held that attorneys' fees in the range of 30% to 40% of the recovery (and even higher) are appropriate. *See, e.g., See Singleton v. Domino's Pizza, LLC*, 976 F.Supp.2d 665, 684-86 (D.Md. 2013) (fees awarded under "the percentage-of-recovery" method in settlements range up to 40%); *McAdams v. Robinson*, 26 F.4th 149, 162 (4th Cir. Feb. 10, 2022) (affirming attorneys' fees award of 43% of the common fund); *Jernigan, v. Protas, Spivok & Collins, LLC*, 2017 WL 4176217, at *5 (D. Md. Sept. 20, 2017) (awarding 40% of the common fund); *Decohen*, 299 F.R.D. at 481-83 (awarding 33% of the common fund); *McDaniels v. Westlake Servs.*, LLC, 2014 WL 556288, at *13-15 (D. Md. Feb. 7, 2014) (awarding 33% of the common fund); *Kelly*, 2020 WL 434473, at *3 ("Contingent fees of up to one-third are common in this circuit."); *Collins v. United Pac. Ins. Co.*, 315 Md. 141, 154, 553 A.2d 707, 713 (1989) (one-third contingent fee is customary and reasonable in Maryland). *Payne v. Sprint Commc'ns Co. L.P.*, 2012 WL 13006270, at *3 (D. Md. Nov. 30, 2012) (awarding 30% of the common fund); *CASA de Maryland, Inc. v. Arbor Realty Trust, Inc.*, 2024 WL 1051120, at *7-9 (D. Md. Mar. 11, 2024) (same); *In re 2U Inc. Sec. Litig.*, No. 8:19-cv-03455-TDC, ECF No. 258 (D. Md. Dec. 9, 2022) (same).

Here, the Fee and Expense Award – setting aside the additional standalone value of the Governance Reforms, discussed below, represents approximately 29% of the Settlement Amount recovered for Novavax, which is well in line with the above Fourth Circuit standards.

Based on their own legal and factual analyses, discussions with the SLC, and a review of the results of the SLC's investigation, Plaintiffs estimate that the total gross proceeds from the

challenged sales were approximately $65 million, and the maximum potential disgorgement amount – based on the total net profits,[9] and assuming liability was established as to all of the selling defendants against whom the Court upheld claims at the pleading stage – would have been approximately $29 million. Nespole Decl. ¶36. The $6.75 million Settlement Payment represents approximately ***23%*** of the estimated maximum potential recovery via disgorgement of insider selling proceeds assuming liability could be established as to all of the selling defendants, and approximately ***40%*** of the estimated maximum potential recovery if (as the SLC concluded) liability could only be established as to defendants Erck and Hermann. Under either analysis, the Settlement Amount reflects a risk-adjusted recovery falling squarely within a range that courts routinely approve. *See, e.g., In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 667 n.22 (E.D. Va. 2001) (citing *Orman v. Am. Online, Inc*, 1998 WL 1969646 (E.D. Va. Dec. 14, 1998) (approving settlement amounting to approximately 5% of the maximum potential recovery); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 246 F.R.D. 156, 167 (S.D.N.Y. 2007) (approving settlement that was "between approximately 3% and 7% of estimated damages"); *Schuler v. Meds. Co.*, 2016 WL 3457218, at *8 (D.N.J. June 24, 2016) (approving settlement representing approximately 4% of estimated damages, noting that the recovery "fell squarely within the range of previous settlement approvals").

---

[9] While Plaintiffs and the SLC would have advocated for full disgorgement of the net profits on the improper stock sales, Defendants would have argued that Plaintiffs could only recover the difference between the proceeds from the sales and what the proceeds would have been had the sales been made at the Company's fair market price on the dates of the sales, and it would come down to a battle of competing experts. Given the somewhat unsettled Delaware law, there was a material risk that disgorgement would be limited. The Settlement Amount ensures the certain payment of $6.75 million in cash to Novavax now rather than a possible payment – and perhaps a lower one – years from now, if ever.

**The Governance Reforms Confer Substantial Benefits on Novavax and Further Support the Fee and Expense Award:**

The Governance Reforms provided for in the Settlement confer an additional substantial benefit on Novavax. The Settlement requires Novavax to implement the following corporate governance measures (among others):

(a) *Insider Trading Policy*: Novavax shall adopt a new, revised Insider Trading Policy, which will now provide that (i) the Chief Legal Officer shall be responsible for administering the Policy; (ii) in addition to dismissal for cause, failures to comply with the Policy may result in disgorgement, cancellation of outstanding stock options, and/or disqualification from performance-based compensation, and the Audit Committee shall administer sanctions; (iii) any complaint that concerns actual or potential violations of the Policy shall be submitted to the Chief Legal Officer, the Chief Legal Officer shall provide quarterly reports to the Audit Committee regarding any complaints, and any complaint that concerns the Chief Legal Officer itself shall be submitted directly to the Audit Committee; (iv) the Chief Legal Officer must submit a request for pre-clearance to the Chief Executive Officer or the Chief Financial Officer for any covered transaction; (v) any 10b5-1 sales plan adopted by a director or officer shall have a minimum duration of six (6) months and cannot be modified, and directors and officers may not trade pursuant to a new 10b5-1 sales plan for a minimum of 90 days in the event of a cancellation of any plan; and (vi) any director or officer 10b5-1 sales plan that could result in the disposition of greater than 40% of then-current holdings must be submitted to the Compensation Committee for its approval no less than 10 days prior to adoption. These measures will help prevent a recurrence of the alleged wrongdoing and violations of the insider trading laws in the future, avoid even the appearance of impropriety on the part of those within the Company, and protect the reputation of the Company, its directors and its employees. In addition, the new Insider Trading Policy shall be made publicly available on the Company's website, providing increased transparency to stockholders and the public.

(b) *Audit Committee Enhancements*: The Audit Committee Charter shall be amended to provide (among other things) that the Audit Committee shall review executive stock sales in light of public statements by executives about the Company's business in order to detect discrepancies that may indicate potential insider trading, and shall receive quarterly reports from both the Chief Compliance Officer and the Chief Safety Officer. These measures will help improve Board-level oversight of stock sales by Company management moving forward, particularly in light of temporally proximate public statements made by Company officers.

(c) *Management-Level Disclosure Committee Charter*: The Company shall adopt a new, formal Charter for the Management-Level Disclosure Committee, with enhanced duties and responsibilities for (among other things) (i) monitoring the content of the Company's public disclosures and the process for preparing such disclosures; (ii) establishing and maintaining a policy designed to ensure that information is disclosed accurately and timely; (iii) evaluating on an annual basis the integrity and effectiveness of the Company's disclosure controls; (iv) conducting an annual review of industry-wide disclosure oversight practices and implement those it deems necessary and appropriate; (v) reviewing drafts of quarterly filings,

earnings press releases and related materials (including earnings call scripts) to evaluate the adequacy and accuracy of the disclosures; and (vi) reporting annually to the full Board. These enhancements to the Company's disclosure controls will improve relevant management- and Board-level oversight and help ensure the accuracy of the Company's public statements in the future.

(d) *Board-Level R&D Committee Enhancements*: The duties and responsibilities of the Research & Development Committee shall be enhanced and will improve Board-level oversight of the Company's test studies, interactions with the FDA, and material regulatory compliance.

(e) *Management-Level Enhancements*: The duties and responsibilities of the Chief Compliance Officer will be enhanced, including through increased and improved interactions between the Chief Compliance Officer, the Audit Committee, and the Chief Legal Officer. In addition, the Settlement provides for enhanced reporting to the Board by the Chief Compliance Officer and the Chief Legal Officer, particularly as it relates to material regulatory compliance issues. Together, these measures will help improve communication between key members of management and the Board and ensure informed Board oversight of the Company's legal and regulatory compliance.

(f) *Other Board-Level Enhancements*: The Nominating and Corporate Governance Committee shall engage an independent consultant to identify director candidates in the event of vacancies, and that consultant shall provide written and oral presentations to the Nominating and Corporate Governance Committee and the full Board containing the consultant's findings and recommendations. This will help ensure qualified and independent directors on the Board when vacancies occur and improve the Board's overall functioning moving forward. In addition, Novavax shall develop a new "Skills Matrix" for incumbent directors, which will ensure concrete, measurable analyses of director expectations and performance and improve Board performance.

*See* Stip., Ex. A.

Operating together, the Governance Reforms, which address the alleged wrongdoing at both the management- and Board-level, will confer real and substantial economic value on Novavax and its stockholders (even if the benefits cannot be quantified with perfect precision), including by (i) helping to avoid a recurrence of the alleged wrongdoing in this Action and the types of damages suffered by the Company here (e.g., liability for securities violations, costs associated with alleged insider selling misconduct and investigations); (ii) improving Novavax's

operational performance through enhanced governance at the Company;[10] and (iii) enabling Novavax to enjoy the price premium the market awards to companies that respond to corporate governance challenges with effective remedial measures, increasing their stock price and long-term stockholder value.[11]

Courts across the country have approved substantial attorneys' fees in settlements based solely on corporate governance reforms. *See, e.g., In re Apple Inc. S'holder Deriv. Litig.*, No. 4:19-cv-05153-YGR (N.D. Cal. July 17, 2024) (approving $6 million for corporate therapeutics) (Nespole Decl., Ex. L); *In re Alphatec Holdings, Inc., Derivative S'holder Litig.*, No. 37-2010-58586-CU-BT-NC (Ca. Super. Ct.-San Diego Cty. Aug. 18, 2014) ($5.25 million in governance-only settlement) (Nespole Decl., Ex. M); *In re F5 Networks, Inc. Derivative Litig.*, No. C06-794 RSL (W.D. Wash. Jan. 6, 2011) ($5 million) (Nespole Decl., Ex. N); *In re Avon Products, Inc.*, No. 651304/2010 (N.Y. Sup. Aug. 1, 2016) ($4 million) (Nespole Decl., Ex. O); *In re CoreCivic, Inc. S'holder Deriv. Litig.*, No. 3:16-cv-03040 (M.D. Tenn. Dec. 2, 2022) ($3.5 million) (Nespole Decl., Ex. P); *In re MiMedx Group. Inc. S'holder Derivative Litig.*, Lead Case, No. 1:18-cv-

---

10 *See, e.g.,* Lawrence D. Brown & Marcus L. Caylor, *The Correlation Between Corporate Governance and Company Performance*, Institutional Shareholder Services (2004) (study commissioned by Institutional Shareholder Services found that "firms with weaker governance perform more poorly, are less profitable, more risky, and have lower dividends than firms with better governance"); Ira M. Millstein & Paul W. MacAvoy, *The Active Board of Directors and Performance of the Large Publicly Traded Corporation*, 98 Colum. L. Rev. 1283, 1318 (1998) (supporting the conclusion that independent and active boards empowered to oversee key judgements about core operations and risks generate better economic value for stockholders).

11 *See, e.g.,* McKinsey & Company Investor Opinion Survey, McKinsey & Company (June 2000) (finding that 80% of the institutional investors in the survey reported they would pay more for a company that responds to challenges with stronger corporate governance, and would be prepared to pay an average 18.3% premium); *see also* Lucian A. Bebchuk & Assaf Hamdani, *The Elusive Quest for Global Governance Standards*, 157 U. Pa. L. Rev. 1263, 1266 (2009); Paul A. Gompers, Joy L. Ishii & Andrew Metrick, *Corporate Governance and Equity Prices*, 118 Quarterly J. Econ. (2003); Lawrence D. Brown & Marcus L. Caylor, *The Correlation Between Corporate Governance and Company Performance*, Institutional Shareholder Services (2004); Vincent Cunat, Mireia Gine, & Maria Guadalupe, *The Vote is Cast: The Effect of Corporate Governance on Shareholder Value*, 67 J. Finance, Oct. 2012.

04486-WMR (N.D. Ga. Dec. 21, 2020) ($3.5 million) (Nespole Decl. Ex. Q); *Nixon-Crenshaw v. Coley*, No. 1:18-cv-25289-AHS, slip op. (S.D. Fla. Oct. 1, 2021) ($2.5 million) (Nespole Decl., Ex. R); *In re 3D Sys. Corp. Derivative Litig.*, No. 0:15-cv-03756-MGL (D.S.C. Sept. 18, 2015) ($2.15 million) (Nespole Decl., Ex. S); *In re Zuora, Inc. Deriv. Litig.*, No. 3:19-cv-05701-SI (N.D. Cal. Sept. 18, 2023) ($2 million) (Nespole Decl., Ex.T).

Plaintiffs respectfully submit that the Governance Reforms negotiated here, standing alone, could support the entire agreed Fee and Expense Award.

**<u>A Review of Other Derivative Settlements with Both a Cash Payment and Governance Reforms Further Shows the Reasonableness of the Fee and Expense Award</u>:**

When the Settlement Amount and the Governance Reforms are considered together, the agreed Fee and Expense Award is even more reasonable. Courts have awarded fees representing a far greater percentage of the settlement in cases that (like here) included both a monetary payment and corporate governance enhancements. *See, e.g., In re Activision, Inc. Shareholder Derivative Litigation,* Case No. CV-06-4771 MRP (C.D. Cal. July 21, 2008)(JTLx) (Nespole Decl., Ex. U) (awarding fees representing 42% of settlement fund where Special Committee formed and settlement also included corporate governance reforms); *In re Juniper Derivative Actions*, 2008 U.S. Dist. LEXIS 109858 (N.D. Cal.) (awarding fees representing 40% of settlement fund where Special Litigation Committee formed and settlement also included corporate governance reforms); *In re Apple Computer, Inc., Derivative Litig.*, 2008 WL 4820784 (N.D. Cal. Nov. 5, 2008) (awarding fees representing 61% of settlement fund where settlement also included corporate governance reforms); *In re comScore, Inc. Shareholder Derivative Litigation*, C.A. No. 1:16-cv-09855-JGK (S.D.N.Y. June 7, 2018) (Nespole Decl., Ex. K) (awarding fees representing 80% of settlement fund where settlement also included corporate governance reforms); *In re Atmel Corp. Derivative Litig.*, No. 5:06-cv-04592-JF (HRL), slip op.

(N.D. Cal. Mar. 31, 2010) (Nespole Decl., Ex. V) (awarding fees representing 51% of settlement fund where settlement also included corporate governance reforms); *Reid v. Sanghi*, Case No. 2019-cv-2389 (Az. Super. Ct. – Maricopa County) (Nespole Decl., Ex. W) (awarding fees representing 75% of settlement fund where settlement also included corporate governance reforms).

### 2. Plaintiffs' Counsel's Skill and Efficiency and the Complexity and Duration of the Litigation

Plaintiffs' Counsel's experience and skill are amply demonstrated here. Plaintiffs secured valuable monetary and non-monetary corporate benefits in an efficient manner and without the necessity of full-blown merits discovery and trial.

At the outset, Plaintiffs' Counsel conducted a thorough pre-suit investigation that included inspection demands pursuant to applicable Delaware law, which resulted in the production of thousands of pages of internal corporate books and records, as well as FOIA request that produced additional relevant documents. Plaintiffs' Counsel then leveraged information from those documents in preparing their derivative complaints, including the operative Complaint in this Action. Plaintiffs' Counsel successfully opposed and defeated (in large part) defendants' motion to dismiss, establishing demand futility as to the insider trading and unjust enrichment claims – a significant achievement in this type of litigation. *See Silverberg v. Gold*, 2013 WL 6859282, at *10 (Del. Ch. Dec. 31, 2013) (recognizing the inherent problems of proof associated with establishing that a corporate fiduciary was using inside information and was motivated in whole or in part by the substance of that information); *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 377-78 (9th Cir. 1995) (finding "the odds of winning [a] derivative lawsuit [are] extremely small" because "derivative lawsuits are rarely successful"); *Kamen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90, 96 (1991) (demand futility requirement is

satisfied only under "'extraordinary conditions'"); *In re Capital One Derivative S'holder Litig.*, 952 F. Supp. 2d 770, 781 (E.D. Va. 2013) ("case law makes clear that futility is not easy to demonstrate"); *In re FAB Universal Corp. S'holder Derivative Litig.*, 148 F. Supp. 3d 277, 281-82 (S.D.N.Y. 2015) ("The doctrine of demand futility, the business judgment rule, and the generally uncertain prospect of establishing a breach of fiduciary duties combine to make shareholder derivative suits an infamously uphill battle for plaintiffs.").

Plaintiffs' Counsel's victory on the motion to dismiss directly caused the formation of the SLC. After the SLC was formed, Plaintiffs' Counsel leveraged their collective experience to engage with the SLC during the course of its investigation and to play a critical role in the negotiation of the Settlement, with respect to both the Settlement Amount and the Governance Reforms. Plaintiffs submit that but for their thorough pre-suit investigations, litigation successes, and efficient and effective efforts following the formation of the SLC, the Settlement now being presented to the Court for approval never would have happened. *Id.*

"The result achieved is the clearest reflection of petitioners' skill and expertise." *In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at *5 (E.D. Pa. June 2, 2004). The result here is particularly noteworthy in view of the vigorous and effective representation provided by defense counsel, as well as the unique challenges arising from the existence of a Special Litigation Committee. *See Zapata v. Maldonado*, 430 A.2d at 786 430 A.2d 779 (Del. 1981) (a special litigation committee can properly act for the corporation with respect to derivative claims, including by moving to dismiss part or all of derivative litigation that is believed to be detrimental to the corporation's best interest); *In re The Mills Corp.*, 265 F.R.D. 246 at 262 (factor favors substantial award where counsel facing "experienced and sophisticated defense attorneys" secures favorable settlement); *Smith v. Krispy Kreme Doughnut Corp.*, 2007 WL 119157, at *2 (M.D.N.C. Jan. 10, 2007) ("Additional skill is required when the opponent is a

sophisticated corporation with sophisticated counsel."); *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 749 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986) ("The quality of opposing counsel is also important in evaluating the quality of plaintiffs' counsels' work.").

**3. Contingency Risk and Public Policy Considerations**

Plaintiffs' Counsel took on the risk of receiving little or no recovery—a major factor supporting an award of attorneys' fees. *Cohn*, 375 F. Supp. 2d at 863, 865-66 ("[I]t is imperative that the filing of contingent class action and derivative lawsuits not be chilled by the failure to award attorneys' fees or by the imposition of fee awards that fail to adequately compensate counsel for the risks of pursuing such litigation.... [B]ecause of the complexity and societal importance of stockholder and derivative litigation, the most able counsel should be obtained. The attorney's fees awarded should reflect this goal."); *Jones v. Dominion Resources Servs., Inc.*, 601 F. Supp. 2d 756, 762 (S.D.W. Va. Mar. 6, 2009)("attorneys undertaking class actions bear substantial risks that the litigation will not result in payment"); *Muhammad*, 2008 WL 5377783, at *8 ("The outcome of the case was hardly a foregone conclusion, but nonetheless counsel accepted representation of the plaintiff and the class on a contingent fee basis, fronting the costs of litigation."). Plaintiffs' Counsel's risks were especially great given the "notoriously difficult and unpredictable" nature of stockholder derivative litigation. *Mathes v. Roberts*, 85 F.R.D. 710, 713 (S.D.N.Y. 1980). Public policy strongly supports rewarding Plaintiffs' Counsel for assuming these risks and driving the litigation to a successful resolution. *See In re Microstrategy, Inc.*, 172 F. Supp. 2d 778, 788 (E.D. Va. 2001); *Fab Universal*, 148 F. Supp. 3d at 284 (private enforcement of stockholders' rights "is clearly in the interest of the public, the markets, and the economy"); *Feinberg v. T. Rowe Price Grp., Inc.*, 610 F. Supp. 3d 758, 772 (D. Md. 2022) ("[P]ublic policy 'supports compensating attorneys for their efforts in prosecuting cases to remedy large-scale problems that would not be financially practicable to litigate on an individual

basis.'"').

#### 4. Time and Expenses Devoted to the Case and Lodestar Cross-Check

Plaintiffs' Counsel expended significant time and effort investigating, litigating, and ultimately resolving this matter, and a lodestar cross-check confirms the reasonableness of the proposed Fee and Expense Award. *Fire & Police Retiree Health Care Fund, San Antonio v. Smith*, 2020 WL 6826549, at *4 (D. Md. Nov. 20, 2020) (reasonableness of fees awarded under the percentage of recovery method "may be cross-checked by the lodestar method"). Where, as here, the proposed award is reasonable in relation to the value of the settlement and under the other relevant factors, courts "take a somewhat truncated approach to the lodestar analysis" and "generally do not apply the same scrutiny" as when they calculate a fee using the lodestar method. *Thomas v. FTS USA, LLC*, 2017 WL 1148283, at *6 (E.D. Va. Jan. 1, 2017); *see also Jones*, 601 F. Supp. 2d at 765 (similar).

The fee awarded "must adequately compensate lead counsel for the time expended on the case." *In re Microstrategy, Inc.*, 172 F. Supp. 2d at 787. "[T]o reward lead counsel for the favorable result achieved . . . and to provide an incentive for competent lawyers to pursue such actions in the future on an essentially contingent basis, the ultimate award must be substantially greater than the lodestar figure." *Id*. at 788. "[T]he fee selected must also, where appropriate, include a reward or enhancement beyond the lodestar figure to account for the difficulty of the case, the degree of success achieved, and other qualitative factors." *Id*.

The reasonableness of the Fee and Expense Award here is underscored by the fact that it reflects no multiplier on Plaintiffs' Counsel's collective lodestar.[12] Plaintiffs' Counsel's collective

---

[12] In computing Plaintiffs' Counsel's lodestar, all time negotiating attorneys' fees and drafting the fee application; all time spent after November 22, 2024; and all time charged by timekeepers who charged less than five hours to the Action, has been excluded. Nespole Decl.

lodestar is $2,032,285.25, which was calculated by multiplying the number of hours that were reasonable and necessary to litigate the case by the attorneys' current hourly rates.[13] After subtracting Plaintiffs' Counsel's collective expenses of $36,056.21, and requested Service Awards totaling $24,000[14] the net fee amount is $1,939,943.79, which reflects a slightly *negative* lodestar multiplier of -0.047. This is below the range courts have found reasonable. *See, e.g.*, *Jones*, 601 F. Supp. 2d at 766 (noting that "[c]ourts have generally held that lodestar multipliers falling between 2[x] and 4.5[x] demonstrate a reasonable attorneys' fee" and approving "fee [that] returns a lodestar multiplier between 3.4 and 4.3"); *Genworth*, 210 F. Supp. 3d at 845 (noting that courts "regularly approve[] attorneys' fees awards with 2-3 times lodestar multipliers" and finding 1.97 multiplier "eminently reasonable"); *Kay Co. v. Equitable Prod. Co.*, 749 F. Supp. 2d 455, 471 (S.D.W. Va. 2010) (multiplier between 2.8 and 3.4 "well within the range considered reasonable"); *Singleton*, 976 F. Supp. 2d at 689 ("lodestar multipliers falling between 2 and 4.5 demonstrate a reasonable attorneys' fee[]"); *Witt v. CoreLogic SafeRent, LLC*, 2018 WL 1560069, at *4 (E.D. Va. Mar. 22, 2018) (Novak, J.) (2.24 multiplier); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d 383, 387 (D. Md. 2006) (2.6 multiplier); *MicroStrategy*, 172 F. Supp. 2d at 787-88 (2.6 multiplier); *Kruger v. Novant Health, Inc.*, No. 1:14CV208, 2016 WL 6769066, at *5 (M.D.N.C. Sept. 29, 2016) (approving fee award of "3.69 times the lodestar"); *Decohen*, 299 F.R.D. at 483 (approving fee award of "3.9 times the lodestar rate."); *Goldenberg v. Marriott PLP Corp.*, 33 F. Supp. 2d 434, 439 n.6 (D. Md. 1998) ("fee requested amounted to a lodestar enhancement of 3.6—well within the average range of 3-4.5"); *Kelly*, 2020 WL 434473, at *7 ("The requested fee would result in a lodestar multiplier of

---

¶48.

[13] *See* Nespole Decl., ¶48. This lodestar is based on counsel's current rates, which is "appropriate to account for the delay in payment to counsel." *Seaman*, 2019 WL 4674758, at *5.

[14] *See* Nespole Decl., ¶50.

2.45—well within the range routinely approved in this Circuit.").

The time was spent on tasks vital to the effective prosecution of the case and to the mediation and settlement process, including, *inter alia*: (i) reviewing Novavax's press releases, public statements, filings with the U.S. Securities and Exchange Commission (the "SEC"), and securities analysts' reports and advisories about the Company; (ii) reviewing media reports about the Company; (iii) researching the applicable law with respect to the claims alleged in the Action and the potential defenses thereto; (iv) preparing and filing multiple complaints in the Action; (v) reviewing and analyzing relevant pleadings in the related Securities Action, and evaluating the merits of, and Defendants' liability in connection with, the Securities Action and the Action; (vi) separately reviewing and evaluating nearly 2,800 pages of non-public documents produced by Defendants in response to inspection demands for books and records pursuant to 8 Del. C. § 220 served by Plaintiffs Snyder, Blackburn, and Rosati, as well as documents produced in response to a FOIA request; (vii) participating in extensive settlement discussions with Defendants' counsel, including an in-person mediation in New York, New York; (viii) participating in extensive substantive merits-based and settlement discussions with SLC counsel, including two mediations in Wilmington, Delaware, as well as numerous separate caucus sessions, joint sessions, and email communications with the Mediator and SLC counsel; and (viii) negotiating the terms of the Stipulation.[15] The work was carefully considered to advance the goals of the litigation, prioritized and executed to produce necessary work product, and organized to avoid unnecessary duplication of effort, and identify efficiencies. *Id.*

Plaintiffs' Counsel's hourly rates are based on periodic assessments of rates used by firms performing comparable work, and courts in this Circuit and across the country have approved

---

15 *See* Nespole Decl., ¶34.

attorneys' fees for stockholder derivative actions using comparable hourly rates. *See, e.g., Altria Grp., Inc.*, 2023 WL 2116803, at *7 (E.D. Va. Feb. 17, 2023) (citing *In re Microstrategy, Inc. Sec. Litig.*, 172 F. Supp. 2d at 788) (finding that hourly rates charged of $500-1,295 for partners; $350-750 for associates; $350-675 for staff attorneys; and $135-305 for paralegals fell "within a reasonable range for complex shareholder derivative actions, 'where the market for ... attorneys is nationwide and populated by very experienced attorneys with excellent credentials.'"); *Feinberg*, 610 F. Supp. 3d at 773, (finding a reasonable lodestar amount where counsel used its hourly rates of $700-1,025 for partners, $775-840 for of counsel, $575-585 for associates, and $290-335 for paralegals—rather than the hourly rates provided by the Local Rules—to calculate its lodestar in complex ERISA litigation); *S. Co. S'holder Derivative Litig.*, 2022 WL 4545614, at *14, n.8 (approving stockholder derivative attorney hourly rates where "partners [rates]. . . range[d] from $875.00 to $1,100.00, associate, staff attorney, and of counsel rates ranged from $311.15 to $675.00, and professional staff rates ranged from $193.00 to $385.00"); *Seaman v. Duke Univ. Health Sys.*, 2019 WL 4674758, at *5 (M.D.N.C. Sept. 25, 2019) (approving hourly rates of $590 to $900 for partners; $395 to $510 for associates, staff attorneys, and contract attorneys; and $280 to $390 for paralegals and other support staff, as "in line with hourly rates used for Class Counsel in other cases"); *see also Feinberg*, 610 F. Supp. 3d at 773 ("a national market rate is appropriate for matters involving complex issues requiring specialized expertise"). Considering complexity and risk, and the skill and experience of counsel, Plaintiffs' Counsel's rates are reasonable.[16]

---

[16] Plaintiffs' Counsel recognize that certain of their rates may exceed prevailing local rates. As noted above, this is proper given the nationwide market for similar services and the "'the complexity and specialized nature of the case.'" *Seaman*, 2019 WL 4674758, at *5. Moreover, even a significant across-the-board reduction in rates would not affect the lodestar analysis here, since the multiplier on Plaintiffs' Counsel's lodestar falls at the low-end of the range deemed

## V. THE SERVICE AWARDS TO PLAINTIFFS SHOULD BE APPROVED

Plaintiffs respectfully request that the Court approve nominal service awards for Plaintiffs ($10,000 to plaintiff Snyder, $5,000 each to Plaintiffs Blackburn and Rosati, and $2,000 each to Plaintiffs Young and Meyer) – to be paid from the Fee and Expense Award—in recognition of Plaintiffs' roles in creating substantial benefits for Novavax and its stockholders. Stip., §4.9; *see* Snyder Decl.; Blackburn Decl.; Rosati Decl. The modest Service Awards are well within the range approved by courts as fair and reasonable, and should be approved. *See In re Presidential Life Sec.*, 857 F. Supp. 331, 337 (S.D.N.Y. 1994) (incentive awards "need not be subjected to intense scrutiny inasmuch as these funds will come out of the attorney's fees"); *Lizondro—Garcia v. Kefi LLC*, 2014 WL 4996248, at *9 (S.D.N.Y. Oct.7, 2014) (service awards common in stockholder representative actions); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 150 (S.D.N.Y. 2010) (service awards properly reward plaintiffs' leadership); *In re Cendant Corp. Derivative Action Litig.*, 232 F. Supp. 2d 327, 344 (D.N.J. 2002) (service awards recognize plaintiffs' public service); *Sauby v. City of Fargo*, 2009 WL 2168942, at *1 (D.N.D. July 16, 2009) (approving awards of $5,000 and $10,000 not "to 'compensate' plaintiffs, but instead serve to encourage people with legitimate claims to pursue the action").

## VI. CONCLUSION

Plaintiffs respectfully request that this Court approve the separately negotiated and agreed Fee and Expense Award and enter the proposed Order and Final Judgment.

---

reasonable in the Fourth Circuit and elsewhere. *See In re Neustar, Inc. Sec Litig*, 2015 WL 8484438, at *10 (E.D. Va. Dec. 8, 2015) (although counsel's rates were above local market rates, low multiplier confirms "the fee request would remain reasonable"). Indeed, Plaintiffs' Counsel lodestar would be $904,175 if the Court were to apply the hourly rates in this District's Local Rules, reflecting a multiplier of 2.212x, which is well within lodestar multiples endorsed in this Circuit. *Supra*, at 27-28.

Respectfully submitted,

Dated: January 9, 2025

By: /s/*Andrew Radding*
**ADELBERG, RUDOW, DORF & HENDLER LLC**
Andrew Radding, Bar No. 00195
7 St. Paul Street, Suite 600
Baltimore, Maryland 21202
Telephone: (410) 986-0824
Email: aradding@adelberg.com

*Liaison Counsel for Plaintiffs*

Benjamin I. Sachs-Michaels
**GLANCY PRONGAY & MURRAY LLP**
745 Fifth Avenue
New York, New York 10151
Telephone: (212) 935-7400
E-mail: bsachsmichaels@glancylaw.com

**ROBBINS LLP**
Craig W. Smith
Shane P. Sanders
5060 Shoreham Place, Suite 300
San Diego, California 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: csmith@robbinsllp.com
ssanders@robbinsllp.com

*Co-Lead Counsel and Counsel for Plaintiffs Charles R. Blackburn and Michele Rosati*

**LEVI & KORSINSKY, LLP**

Gregory M. Nespole (*pro hac vice*)
Daniel Tepper (*pro hac vice*)
55 Broadway, 10th Floor
New York, NY 10006
Telephone: 212.363.7500
Facsimile: 212.363.7171
E-mail: gnespole@zlk.com
dtepper@zlk.com

*Co-Lead Counsel and Counsel for Plaintiff Amy Snyder*

**THE BROWN LAW FIRM, P.C.**
Timothy Brown, Esq.
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
E-mail: tbrown@thebrownlawfirm.net

Mark Cotton (Bar No. 14463)
10665 Stanhaven Place
Suite 300
White Plains, MD 20695
E-mail: mark@cottonesquire.com
Telephone: (202) 802-6551

Camille Wagner, Esq.
Wagner PLLC
1629 K St. NW, Suite 300
Washington, DC 20006
E-mail: law@myattorneywagner.com
Telephone: (202) 492-4659

*Additional Counsel for Plaintiffs and Counsel for Plaintiff Shui Shing Yung*

**GOLDMAN & MINTON, P.C.**
Thomas J. Minton (Bar No.: 03370)
3600 Clipper Mill Road, Suite 201
Baltimore, MD 21211
Telephone: (410) 783-7575
Facsimile: (410) 783-1711
E-mail: tminton@charmcitylegal.com

**HYNES & HERNANDEZ, LLC**
Michael J. Hynes
Ligaya T. Hernandez
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
Telephone: (484) 875-3116
E-mail: lhernandez@hh-lawfirm.com
mhynes@hh-lawfirm.com

*Additional Counsel for Plaintiffs and Counsel for Plaintiff Robert E. Meyer, as Beneficiary of the Robert E. Meyer (IRA)*